Payne & Dewey *v.* Treadwell.

---

## PAYNE & DEWEY *v.* TREADWELL *et al.*

*Hart* v. *Burnett* (15 Cal. 530) holding—First, that San Francisco was, at the date of the conquest and cession of California, and long prior to that time, a pueblo, entitled to and possessing all the rights which the law conferred upon such municipal organizations ; Second, that such pueblo had a certain right or title to the lands within its general limits, and that the portions of such lands which had not been set apart or dedicated to common use, or to special purposes, could be granted in lots, by its municipal officers, to private persons in full ownership ; Third, that the authority to grant such lands was vested in the Ayuntamiento, and in the Alcaldes, or other officers who, at the time, represented it, or who had succeeded to its "powers and obligations ;" Fourth, that the official acts of such officers, in the course of their ordinary and accustomed

Payne & Dewey *v.* Treadwell.

duties, and within the general scope of their powers, as here defined and explained, will be presumed to have been done by lawful authority, affirmed.

A grant by an Alcalde of a town lot in San Francisco, after the conquest and cession of California, down to the incorporation of the city, in April, 1850, will be presumed, until the contrary be shown, to be within the authority of such Alcalde, and the lot granted will be presumed to be within the limits of the pueblo.

The powers and authority which had been conferred by law upon municipal officers of the pueblo to grant pueblo lands were not suspended, *ipso facto*, by the war with Mexico, or by the conquest, and the fact that such officers, during the military occupation, and after the complete conquest and cession, were Americans, or held their office under American authority, did not change the powers and obligations which, by the existing laws of the country, belonged to such municipal officers. And the same presumptions attach to their grants of lots, whether made before or after the conquest and cession.

The question of the boundary lines of the pueblo should not be left to the jury, to be determined by parol proof.

The authorities, as to the presumptions in favor of the validity of grants made by public officers, cited and approved.

The center of the old presidio square is the initial point for a survey of the four square leagues to which the pueblo is entitled, and the survey is to be made, according to the Ordinanzas de Tierras y Aguas, in all directions, *i. e.*, north, south, east and west, so as to include in all the four square leagues—making up for deficiencies in one direction (where these exist by reason of water being reached, etc.) by including the quantity thus deficient in another line or lines.

According to these rules of measurement, the *fundo legal* of the pueblo of San Francisco is bounded upon three sides by water; and hence the fourth line must be drawn for quantity east and west, straight across the peninsula, from the ocean to the bay. The four square leagues—exclusive of the military reserve, church buildings, etc.—constitute the municipal lands of the pueblo of San Francisco.

Where the land granted by an Alcalde is shown to be within the limits of the four square leagues thus measured, the presumption attaches that it was pueblo land, grantable as such, and that the Alcalde grant passed the title to the grantee. This presumption might be repelled by proof of an express assignment of the lands of the pueblo, which did not include the land granted by the Alcalde, or by proof that this was land reserved as a fort site, etc., or proof of an anterior or better title to the land by grant from some officer or body authorized to make it.

A plaintiff suing for a lot in San Francisco, may rest his case, *prima facie*, upon an Alcalde grant in the usual form, and no further proof of title will be required, than proof that the land granted is situated within the four square leagues, measured from the center of the presidio square, in the manner directed by the ordinances.

San Francisco having been constituted, by a public, political act of the former government, a pueblo, Courts will take judicial notice of its existence, powers and rights, and among these last, its general boundary and jurisdiction.

Payne & Dewey *v.* Treadwell.

The Act of the Legislature of 1858, validating the Alcalde grants, mentioned in the proviso to the second section of the Van Ness Ordinance, is effectual for that purpose, whether the grants were originally valid or not, or whether the title of the city of San Francisco came by grant to the old pueblo, or had its origin, by presumption or grant, in the Act of Congress.

A municipal corporation is a public institution, created for public purposes. The municipality is a political subdivision or department of the State, governed, regulated and constituted by public law; the agents who administer its affairs derive their powers from the Legislature, and can only act in obedience to legislative authority. The original power to control, as well as to create them, is in the Legislature; and the Legislature can as well immediately direct the use and disposition of the public lands of such corporation, as a general rule, as it can mediately so do by appointing or providing for the appointment of agents, or giving authority for that purpose; in other words, what the Legislature can authorize to be done, it can itself do.

As to the pueblo lands of San Francisco, the agents of that municipal corporation can sell or dispose of them only in the way, and according to the order of the Legislature; and, therefore, the Legislature ·may, by law operating immediately upon the subject, dispose of this property, or give effect to any previous disposition, or attempted disposition, of it. The property itself is a trust, and the Legislature is the prime and original controlling power, managing and directing the use, disposition and direction of it.

To impeach the testimony of F., a witness for plaintiff, by showing that, on a former occasion, he had sworn differently, defendant offered in evidence a statement on motion for new trial and on appeal, in a former suit between the parties, purporting to contain all the evidence, and agreed to as correct by the attorneys therein, in which statement there appeared the testimony of F. on that trial: *Held*, that the statement was not admissible; that it was made for a particular purpose, and was not proof except for that purpose—certainly not to impeach F., who neither made nor signed it.

The presumption of validity attends every grant issued by parties authorized to grant, when there is nothing on its face impeaching its validity. It is incumbent on those who contest its validity to support their objections. The burden of proof rests upon them.—FIELD, C. J.

Parties who do not claim under any conveyance from the authorities of the pueblo of San Francisco, and are strangers to the title, cannot object to Alcalde grants of land therein, that they are not made in furtherance of the trust for which the lands were assigned to the pueblo. It is no concern of theirs whether the Ayuntamiento, in authorizing Alcaldes to grant, abused its power or not.—FIELD, C. J.

If the grants in question, issued in March, 1850, pursuant to the order of the Ayuntamiento, were issued improperly—in cases where the laws at the time in force did not contemplate—it is for the city succeeding to the rights of the pueblo to interfere. Until such interference, the title must be held good as against third persons.—FIELD, C. J.

In an action to recover the possession of real property, none of the technical allegations, peculiar to the old action of ejectment, are necessary.

Payne & Dewey *v.* Treadwell.

There is but one form of civil actions in this State, and all the forms of pleadings, and the rules by which their sufficiency is to be determined, are prescribed by the Practice Act. Our system requires the facts to be alleged as they exist, and repudiates all fictions.

Only such facts need be alleged as are required to be proved, except to negative a possible performance of the obligation, which is the basis of the action, or to negative an inference from an act which is, in itself, indifferent.

In ejectment, the only facts necessary to be alleged are, that the plaintiff is seized of the premises, or of some estate therein in fee, or for life, or for years, according to the fact, and that the defendant was in their possession at the commencement of the action, and withholds the possession from plaintiff. The seizin is the fact to be alleged. It is a pleadable and issuable fact, to be established by conveyances from a paramount source of title, or by evidence of prior possession.

There is no necessity, in a complaint in ejectment, of negativing the possible rightful character of defendant's possession. Such possession is a pleadable and issuable fact; but if it rest upon any existing right, defendant must show it affirmatively in his defense.

An allegation that the possession of defendant is " wrongful or unlawful," is not the statement of a fact, but of a conclusion of law. The words are mere surplusage, and though they do not vitiate, they do no good.

On the trial in ejectment, plaintiff can rest his case, in the first instance, upon proof of his seizin, and of the possession by defendants. From these facts, when established, the law implies a right to the present possession in the plaintiff, and a holding adverse to that right in the defendants.

Where plaintiff has been in possession of the premises for which he sues, it will be sufficient for him to allege such possession, and the entry, ouster and continued withholding by the defendant. Such allegations are proper when they correspond with the facts, but they are not essential. In this State, possession does not always accompany the legal title, as the statute authorizes a sale and conveyance of land held adversely by third persons.

*Goodwin* v. *Stebbins* (2 Cal. 105) so far as it holds that the averment that plaintiffs " were lawfully entitled to the possession of the premises," was an allegation of a material fact, and hence sufficient, not law.

*Payne* v. *Treadwell* (5 Cal. 310)—in which the averment of the complaint was, that plaintiffs had " lawful title as owners in fee simple of the premises," and " that the defendant is in possession, and unlawfully withholds the same," overruled, so far as it decides that a more particular statement of " the circumstances " of defendant's possession or withholding is necessary.

*Gregory* v. *Haynes* (October term, 1859, No. 2148) overruled.

A refusal to give an instruction cannot be urged as error, for the first time, on a petition for rehearing in the Supreme Court.

Where the complaint in ejectment avers the ownership and right of plaintiff, and the possession and withholding by defendant in general terms, without stating any time when plaintiffs' title accrued or existed, and without making any allegation as to damages for rents and profits, but simply praying judgment therefor in a given sum, and the complaint is demurred to as not stating facts sufficient, and a general judgment for possession, and $2,250 damages is given: *Held,* that

damages cannot be recovered for any period preceding the commencement of the action; but that this point, to wit: that the complaint does not support the judgment for damages, cannot be raised for the first time, on petition, for rehearing in the Supreme Court—the defendant on the first hearing in this Court, having put his objection to the general judgment for damages, on the ground of error in the charge of the Court below to the jury, and of error in the admission of evidence as to the rents and profits; the point of his objection being, that a recovery for rents and profits beyond three years, was barred by the statute, and this Court having decided against him, because the point was not properly presented by the record.

Where damages are claimed for use and occupation prior to the commencement of the action, the complaint must state the title of plaintiff as existing at some prior date (to be designated) and as continuing up to the commencement of the action, and the entry of defendant at some date subsequent to that of the alleged title.

In this case, the judgment for damages must stand, as this Court has no means of determining the manner in which the damages were made up by the jury, or whether any damages for the period preceding the commencement of the action were found.

Where the Court below charged the jury, among other things, that if they found for plaintiff, he was entitled to recover the value of the use and occupation from October, 1853—a period long anterior to the commencement of the action, the complaint not containing any averment as to the time when plaintiff's title accrued or existed, etc.—and the defendant excepted generally to all of the charge, and followed this general exception up by a specification of certain portions of the charge to which his exception was particularly directed: *Held*, that this general exception did not cover the charge as to damages.

APPEAL from the Twelfth District.

Ejectment for a lot in San Francisco. Plaintiffs had verdict and judgment, with $2,250 damages.

On the trial, defendants produced the record and proceedings in the equity case of *Treadwell* v. *Payne & Dewey*, (15 Cal.) containing a statement on motion for new trial, and on appeal, agreed to as correct by the attorneys of the respective parties, and purporting to contain all the evidence in that cause, and offered to read in evidence therefrom the testimony of Findla—the original grantee of the lot in suit—to show that he had sworn on that trial to certain facts which would contradict his testimony in the present case. "To which evidence the plaintiffs objected, and the Court sustained the objection   *   *   *   *   to which the defendant then and there excepted." This is the whole record on this point.

Payne & Dewey *v*. Treadwell.

As to the Statute of Limitations, defendants, in their answer, plead the statute of five years.

On the trial, plaintiffs asked a witness as to the value of the monthly use and occupation of the premises from October, 1855, to date. " To which question defendants object, which objection the Court overrules, and defendant excepts." This is the entire record on this point.

As to the point relative to the damages, the complaint was filed October, 1857. The Court charged the jury that, if they found for plaintiffs, they were entitled to recover the value of the use and occupation from October, 1853, to date of trial. The record then shows that defendants excepted specifically to various charges of the Court, not including, however, this particular charge. The record contains the general words, " and excepted to all said charge."

Verdict for plaintiffs, and for $2,250 damages : judgment accordingly. Defendants appeal.

*J. P. Treadwell*, for Appellants.

*D. Lake*, for Respondents.

The briefs of counsel are omitted, for the reason that the main questions involved, are presented and decided in *Hart* v. *Burnett*, (15 Cal.) and the points peculiar to this case sufficiently appear in the opinions of the Court.

BALDWIN, J.—This was suit to recover a lot in San Francisco, the plaintiff deraigning title through a grant made by an Alcalde after the conquest or possession by the authorities of the United States. The defendants questioned the validity of this grant. We considered this question in the recent case of *Hart* v. *Burnett*. We held in that case : " First, that San Francisco was, at the date of the conquest and cession of California, and long prior to that time, a pueblo, entitled to and possessing all the rights which the law conferred upon such municipal corporations. Second, that such pueblos had a certain right or title to the lands within its general limits, and that the portions of such lands which had not been set apart or dedicated to common use, or to special purposes, could be granted in lots, by its municipal officers, to private persons, in full ownership. Third, that the authority to grant such lands was vested in the Ayuntamiento and in the Alcaldes or other officers who at the time represented it, or who had succeeded

to its powers and obligations. Fourth, that the official acts of such officers, in the course of their ordinary and accustomed duties, and within the general scope of their powers, as here defined and explained, will be presumed to have been done by lawful authority."

We supported these propositions by authorities and facts, and upon further reflection, we are confirmed in the views there presented.

This decides the principal question involved.

1. It is insisted that the Court below erred in instructing the jury that the fact of a grant by an Alcalde of a town lot after July 7th, 1846, down to the incorporation of the city, April 15th, 1850, was *prima facie* evidence that he had a right to make such grant of the land within the limits of such pueblo, and that said grant was *prima facie* proof that the land mentioned .in such grant was within such limit. The ground of objection to this ruling is, that the location of the premises in dispute is matter of fact and not matter of law, and that the Court erred in assuming that the premises in dispute were shown to be within the limits of the pueblo by the mere fact of the grant by the Alcalde.

In reference to the rights of the pueblo of San Francisco, we said in *Hart* v. *Burnett* (15 Cal. 542) : " It follows, from what has been already stated, that when, near the close of 1834, a municipality was erected at the presidio of San Francisco, by the orders of the Governor and Territorial Deputation of California, and that place was officially recognized as a pueblo, and its organization completed by the election of the municipal officers provided for by law, such pueblo became, *ipso facto,* vested with some right or title to four square leagues of land, measured either in a square or prolonged form, from the presidio square, as a general central point, excepting so much of the space within such general limits as might not be susceptible of grant, on account of its being water, the private property of individuals or corporations, or lands dedicated to or reserved for other purposes." And again (p. 543) : " It appears from official maps made under the direction of the United States Surveyor General and the Superintendent of the United States Coast Survey, that the old presidio of San Francisco was situated near the middle of the northern extremity of the peninsula formed by the ocean and the bay of that name ; that the width of this peninsula, as far south as the Mission creek, is less than two leagues, and that still further south, to the Buri Buri, or Sanchez rancho, the average width is just about two leagues, although two or three points, as Lobos and Avisadero, project somewhat beyond these points, very

nearly corresponding with indentations, as Mission bay and Merced lake, on the opposite sides.  Of course, the pueblo could acquire no right or title to the ocean or bay; and, consequently, according to the law of its foundation, the four square or common leagues would be taken in a prolonged, instead of a square form."  Further, we said (p. 549): "If Governors of California have granted lands within the general limits of pueblos, it will be presumed, unless the contrary be shown, that such grants were made in accordance with the objects and uses for which such lands had been assigned and dedicated by the laws to the pueblos.  The whole matter was subject to the control and direction of the Governor and Territorial Deputation, and the official acts of such officers within the general scope of their powers are presumed to have been done by lawful authority.  (*United States* v. *Perchman,* 7 Peters, · 95.)"  And again (p. 552): "The Mexican laws relating to the survey of the four square leagues which the law assigned to the pueblo (found in ch. 11, p. 96, of the Ordinanzas de Tierras y Aguas) are so very plain and specific that there could have been no possible difficulty in determining the exact boundaries.  They are precisely fixed by the law itself.

The authorities hold that a grant or concession made by a foreign government or its officers, creates a legal presumption that the acts of such agents are within the sphere· of their duties until the contrary appears.  In *Reynolds* v. *West* (1 Cal. 326) Mr. Justice Bennett uses this language : "The grant by the Alcalde in this case was, according to the testimony of Guerrero and Padilla, made in accordance with the law and customs of the country; and custom and usage, when once settled, are equivalent to law, though they may be comparatively of recent date.  (*Strother* v. *Lucas,* 12 Peters, 410.) . The presumption is in favor of the validity of every grant issued in the forms prescribed by law; and it is incumbent on him who controverts, to support his objections.  The burden of proof lies on him.  (*Patterson* v. *Jenks et al.* 2 Peters, 216.)  It is settled by the decisions of the Supreme Court of the United States, that a grant or *concession,* made by an officer under a foreign government, in the course of his ordinary or accustomed duties, creates a legal presumption that he acts within the sphere of his duties, until proof is made, by those who deny, that such power does not exist.  (*Strother* v *Lucas,* 12 Pet. 410, 437 ; *United States* v. *Arredondo et al.* 6 Pet. 691.)  In the case of Arredondo, it was decided that fraud cannot be presumed, but must be proved; and that the

signature of an officer, in his official character, will always be received, upon the principle that public functionaries are supposed to act with their legitimate, and not usurped functions.

"It strikes us that, according to the decisions above cited, the sole question touching the validity of the plaintiff's title, is the power of the Alcalde to convey."

The cases referred to by the Court maintain the doctrine asserted. It is true, that the rule laid down in several cases has reference to the officers of a foreign government; but it is hard to see why the principle is not the same when applied to American officers administering the laws of the foreign government which are temporarily in force in the conquered territory. It would seem that convenience and reason demand the application of the rule in such cases—a rule which cannot be attended with injurious consequences, since it is within the power of any one interested, to rebut it by proper testimony.

In *Hart* v. *Burnett et al.* (p. 559) we held that the conquest and cession did not affect the powers of the officers of a pueblo to grant the lands of such a pueblo; and we now repeat, as a formal proposition, what we stated in that opinion, viz: that the powers and authority which had been conferred by law upon municipal officers of a pueblo to grant pueblo lands, were not suspended *ipso facto* by the war or by the conquest, and that the fact that such officers, during the military occupation, and after the complete conquest and cession, were Americans, or held their office under American authority, did not change the powers and obligations which, by the existing laws of the country, belonged to such municipal officers. And we think this doctrine is fully sustained by the authorities to which we there referred (p. 559). Now, if these officers had the same power after as before the conquest, we can see no reason why the same presumptions do not attach to the exercise of those powers.

To hold that the question of boundary lines shall be left to be determined in every case according to parol proof, would be to open the door to endless and fruitless litigation, and give rise to such uncertainties as would deny practically the benefit of any rule to those interested. It would be of little use to any man to have an Alcalde grant, if there were no means left of locating the premises, or if this question were to be perpetually subject to opposing parol contestation.

In *Patterson* v. *Jenks*, (2 Pet. 225) C. J. Marshall, delivering the opinion of the Supreme Court of the United States, held that a grant

Payne & Dewey *v.* Treadwell.

of the Governor of Georgia was presumptively valid; using this language: "Undoubtedly the presumption is in favor of the validity of every grant issued in the forms prescribed by law, and it is incumbent on him who controverts, to support his objections. The whole burden of proof rests on him." The able opinion of Mr. Justice Baldwin, in the *United States* v. *Arredondo,* (6 Peters, 725) reviews the whole doctrine of presumption of the regularity and validity of grants. These presumptions, according to this case, attach to all granting officers. The Court say: "The judicial history of the landed controversies, under the land laws of Virginia and North Carolinia, as construed and acted on within those States, and in those where the lands ceded by these States to the United States lie, and Pennsylvania, whose land tenures are very similar in substance—in all which, the origin of titles is in very general, vague, inceptive equity—will show the universal adoption of the rule, that the acts of public officers in disposing of public lands, by color or claim of public authority, are evidence thereof until the contrary appears, by the showing of those who oppose the title set up under it, and deny the power by which it is professed to be granted. Without the recognition of this principle, there would be no safety in title papers, and no security for the enjoyment of property under them. It is true, that a grant made without authority is void under all governments, (9 Cr. 99 ; 5 Wheat. 303) but in all, the question is, on whom the law throws the burden of proof of its existence or non-existence. A grant is void, unless the grantor has the power to make it; but it is not void because the grantee does not prove or produce it. The law supplies this proof by legal presumption, arising from the full, legal and complete execution of the official grant, under all the solemnities known or proved to exist, or to be required by the law of the country where it is made and the land is situated.

"A patent under the seal of the United States, or a State, is conclusive proof of the act of granting by its authority; its exemplification is a record of absolute verity. (*Paterson* v. *Winn,* 5 Pet. 241.)

"The grants of colonial governors before the Revolution, have always been, and yet are, taken as plenary evidence of the grant itself, as well as authority to dispose of the public lands. Its actual exercise, without any evidence of disavowal, revocation or denial by the king, and his consequent acquiescence and presumed ratification, are sufficient proof, in the absence of anything to the contrary, (subsequent to the grant) of the royal assent to the exercise of his prerogative by his local

governors. ' This, or no other Court, can require proof that there exists in every government a power to dispose of its property; in the absence of any elsewhere, we are bound to presume and consider that it exists in the officers or tribunal who exercise it by making grants, and that it is fully evidenced by occupation, enjoyment and transfers of property, had and made under them, without disturbance by any superior power, and respected by all coördinate and inferior officers and tribunals throughout the State, colony or province where it lies.

"A public grant, or one made in the name and assumed authority of the sovereign power of the country, has never been considered as a special verdict; capable of being aided by no inference of the existence of other facts than those expressly found or apparent by necessary implication, an objection to its admission in evidence on a trial at law or a hearing in equity, is in the nature of a demurrer to evidence on the ground of its not conducing to prove the matter in issue." And in *Strother* v. *Lucas* (12 Pet. 410) the same general doctrine is affirmed. Not less explicit is the ruling of the same Court in the *United States* v. *Clarke* (8 Pet. 452). C. J Marshall says: "It has already been stated that the acts of an officer, to whom a public duty is assigned by his king, within the sphere of his duty are *prima facie* taken to be within his power." And in *Delassus* v. *United States* (9 Pet. 134) the same great jurist said: "A grant or a concession made by an officer, who is by law authorized to make it, carries with it *prima facie* evidence that it is within his powers. No excess of them or departure from them is to be presumed." But if this presumption of the location of the lot within the bounds of the pueblo does not arise from the principle announced in the foregoing cases, and affirmed in our own Court, yet the rule referred to in the opinion in *Hart* v. *Burnett* (p. 552) fixes the boundaries of this pueblo as a *prima facie* intendment, in the absence of proof of actual demarcation of limits.

By the instructions referred to in the opinion, (the Ordinanzas de Tierras y Aguas) the point from which the survey of the four square leagues to which the pueblo was entitled, is the center of the old presidio square, and the survey is to be made in all directions, *i. e.*, north, south, east, and west, so as to include, in all, the four square leagues—making up for deficiencies in one direction (where these exist by reason of water being reached, etc.) by including the quantity thus deficient in another line or lines. By applying these rules of measurement to the peninsula of San Francisco, and taking the center of the old presidio square

as the initial point of the survey, we find that the *fundo legal* of that pueblo is bounded upon three sides by water, and that the fourth line must be drawn for quantity east and west, straight across the peninsula, from the ocean to the bay.   The four square leagues (exclusive of the military reserve, church buildings, etc.) north of this line, constitute the municipal lands of the pueblo of San Francisco.   The property here sued for is within this area.

Where the land granted is shown, as in this case, to be within the limits of the four square leagues assigned by law to the pueblo, and measured, according to the ordinances, from the point which is made the central or initial point by the law or order of its foundation, the presumption at once attaches that it was pueblo land, and grantable as such; and consequently, that the Alcalde grant passed the title to the grantee.   This presumption might be repelled, of course, by proof of an express assignment of the lands of the pueblo, which did not include the land granted by the Alcalde, or by proof that this was land reserved as a fort site, etc., or proof of an anterior or better title to the land by grant from some officer or body authorized to make it.   But a plaintiff suing for a lot in San Francisco may rest his case *prima facie* upon an Alcalde grant in the usual form, and no further proof of title is required, than proof that the land granted is situated within the four square leagues, measured from the center of the presidio square, in the manner directed by the ordinances.

San Francisco having been constituted, by a public, political act of the former government, a pueblo, we must take judicial notice of its existence, powers and rights, and among these last, its general boundary and jurisdiction.   Greenleaf (p. 8, sec. 6) states the rule thus: " Courts also take notice of the territorial extent of the jurisdiction and sovereignty, exercised *de facto* by their own government; and of the local divisions of the country, as into States, provinces, cities, towns, local parishes, or the like, so far as political government is concerned or affected; and of the relative positions of such local divisions, but not of their precise boundaries, farther than they may be described in public statutes."   (See, also, 5 Wendell; 1 Scammon; 9 Shepley, referred to in note.)

So Courts are bound to take notice of matters of public history affecting the whole people.   So of the laws and general acts of a public character, of judicial and political officers.   Of such would be those acts creating and regulating pueblos; and this rule applies as well to

the acts and officers of the former government as to those of its successor. (1 Greenl. Ev. sec. 7, and cases.)

Now, that the Alcalde is the proper officer to make the grant is unquestionable. The same presumptions in regard to the regularity and effect of his proceedings attach to him as to other officers. The lands in dispute were within two miles of the presidio square, and consequently within the limits which the law assigned to the pueblo. We have seen that the grant to the pueblo is presumed to be of four square leagues, to be laid off in a particular manner, which is determined by the nature of the land, etc. We do not see that within that distance the acts of the officer authorized to grant these lots of the pueblo are not to be presumed to be regular and authoritative. Especially are we warranted in so holding, after repeated decisions of the Court affirming this doctrine. Where the officer is authorized to grant only within the four square leagues, the property of the town, and does grant within that distance, it is no violent presumption to suppose that the land granted is that of the pueblo. The presumption may be rebutted; but the proof of the grant, and proof that the land was within the distance allowed, would be sufficient to raise a *prima facie* case of title.

Another ground might be taken, even if we are mistaken in the general view we have presented; that is, that the Van Ness Ordinance and Act of 1858 give full and conclusive effect to such grants as this. The proviso to the second section of the ordinance, which was confirmed by the Legislature, is in these words: " Provided, that all persons who hold title to lands within said limits, by virtue of any grant made by any Ayuntamiento, Town Council, Alcalde or Justice of the Peace of the former pueblo of San Francisco, before the seventh day of July, 1846; or grants to lots of land lying east of Larkin street and northeast of Johnson street, made by any Ayuntamiento, Town Council or Alcalde of said pueblo since that date, and before the incorporation of the city of San Francisco by the State of California, and which grant, or the material portion thereof, was registered or recorded in a proper book of record, deposited in the office, or custody, or control of the Recorder of the county of San Francisco, on or before the third day of April, A. D. 1850, or by virtue of any conveyance duly made by the Commissioners of the funded debt of the city of San Francisco, and recorded on or before the first day of January, 1855, shall, for all the purposes contemplated by this ordinance, be deemed to be the possessors of the land so granted, although the said lands may be in the

actual occupancy of persons holding the same adverse to the said grantees."

" Section 3. The patent issued, or any grant made by the United States to the city, shall inure to the several use, benefit and behoof of the said possessors, their heirs and assigns, mentioned in the preceding section, as fully and effectually, to all intents and purposes, as if it were issued or made directly to them individually and by name." Conceding, for the argument, then, that these Alcalde grants were not valid, because not authorized, we cannot see, if either by the Act of Congress or otherwise, the city of San Francisco had title to these lands, that the Legislature had not authority, for the reasons given in *Hart* v. *Burnett*, to validate the grants made in her name or the name of her predecessor. Possessing the general political dominion, and this property belonging to a political corporation, deriving all of its powers from the political authority, the Legislature is competent to validate an act already done, for the disposition of this property, as well as to authorize it beforehand. This we understand to be the effect of the authorities cited in *Hart* v. *Burnett* in the original opinion, and that on the petition for rehearing. We did not, then, elaborate the general proposition taken, though the authorities were referred to. The principle of the numerous cases cited is, that a municipal corporation is a public institution, created for public purposes; that the municipality is a political subdivision or department of the State, governed and regulated, and constituted by public law; that the agents who administer its affairs derive their powers from the Legislature, and can only act in obedience to legislative authority; that the original power to control, as well as to create them, therefore, is in the Legislature; and that the Legislature can as well *immediately* direct the use and disposition of this public property, as a general rule, as it can *mediately* do this by appointing or providing for the appointment of agents, or giving authority for that purpose; in other words, what the Legislature can authorize to be done, it can itself do. The agents of the corporation can sell or dispose of this property of the corporation, only in the way and according to the order of the Legislature; and therefore the Legislature may, by law operating immediately upon the subject, dispose of this property or give effect to any previous disposition or attempted disposition of it. The property itself is a trust, and the Legislature is the prime and original controlling power, managing and directing the use, disposition and direction of it. Otherwise, the solecism would appear of a derivative power,

higher in degree than, and different in kind from, the source of its derivation. Thus in *People* v. *Morris* (13 Wend. 337) it is said : " The distinction between public and private corporations is strongly marked, and as to all essential purposes, they correspond only in name. We speak of the erection of a town or county, and the term would be just as appropriate when applied to cities or villages. They are severally political institutions, erected to be employed in the internal government of the State. There is no contract between the government and governed, for but one party is concerned—the public—and the inhabitants upon whom the powers and privileges are conferred are mere trustees, who hold and exercise such powers for the public good. The only interest involved is the public interest, and no other is concerned in their creation, continuance, alternation or renewal. The nature and operation of these corporations repudiate the idea of vested rights, and therefore no evil arising out of them could have influenced the convention. *We know of no vested rights of political power, in any citizen or body of citizens, except those conferred by the Constitution.* That is our bill of rights, and is analogous to those granted to kingdoms or minor communities, such as towns and cities, by princes and superior lords on the continent, or by the crown of England."

So Smith, in his Commentaries on Statute and Constitutional Law, (399) cites the following passage from the decision of the Supreme Court of the United States, pronounced by Chief Justice Marshall, in the Dartmouth College case : " If the act of incorporation be a grant of political power—if it create a civil institution to be employed in the administration of the Government, or if the funds of the college be *public property*, or if the State of New Hampshire, as a Government, be alone interested in its transactions, the subject is one in which the Legislature of the State may act according to its own judgment, unrestrained by any limitation of power imposed by the Constitution of the United States." And at page six hundred and thirty-five, the Chief Justice says : " Whence can be derived the idea that the Dartmouth College has become a public institution, and its trustees and public officers exercising the powers conferred by the public for public objects?" And at page six hundred and forty-one, he holds that the trustees are not public officers, and that the corporation is not " a civil institution, participating in the administration of government." And in the same case, at pages six hundred and forty-five to six hundred and sixty-one, Justice Washington says : " There are two kinds of corporations, aggre-

gate, viz: such as are for public government, and such as are for private charity.   The first are those for the government of a town, city, or the like, and being for public advantage, are to be governed according to the law of the land.   Of these, there are no particular founders, consequently, no particular visitor.   There are no patrons of these corporations.   But private and particular corporations are different.   These corporations, civil and eleemosynary, which differ from each other so especially in their nature and constitution, may very well differ in matters which concern their rights and privileges, and their *existence and subjection to public control.*   The one is the mere creature of public institution, created exclusively for the public advantage, without other endowments than such as the Government may bestow upon it, and having no other founder or visitor than the Government," etc.   It would seem reasonable that such a corporation may be controlled, and its constitution altered and amended by the Government, in such manner as the public interest may require.   Such legislative interferences cannot be said to impair the contract by which the corporation was formed, because there is in reality but one party to it; the trustees or government of the corporation being merely the trustees for the *public,* the *cestui que trust* of the foundation.   These trustees, or governors, have *no interest,* no privileges or immunities, which are violated by such interferences, and can have no more right to complain of them than an ordinary trustee, who is called upon in a Court of Equity to execute the trust.   They accepted the charter for the public benefit alone, and there would seem to be no reason why the Government, under proper limitations, should not alter or modify such grant at pleasure; but the case of a private corporation is entirely different."

In the case of *The State of Maryland, for the use of the County of Washington,* v. *The Baltimore and Ohio Railroad Company,* the facts were these: In 1836, the State authorized, by statute, a subscription of $3,000,000 to the capital stock of the company, provided it should be located through Washington county; and provided, that if the company should not so locate the road, they should forfeit $1,000,000 to the State, *for the use of Washington county.*   The corporation accepted the act, but located the road *without* Washington county; whereupon the Commissioners of the county brought suit, in the name of the State, for the use of the county, in February, 1846, against the company, for the forfeiture of $1,000,000.   In March, following, the Legislature passed an act, repealing as much of the previous act as required the

company to locate the road through Washington county, and remitting and releasing the forfeiture of $1,000,000, and declaring any suit instituted to recover the sum " discontinued and of no effect." The company pleaded this act in bar of the action—commenced before the passage of the act—and the State Courts decided in favor of the defendants; and on a writ of error, the Supreme Court of the United States affirmed the decision. Chief Justice Taney, in delivering the opinion of the Court, (3 How. 550) says: " They (the Commissioners) are a corporate body, it is true, and the members who compose it are chosen by the people of the county; but, like similar corporations in every other county in the State, it is created for the *purpose of government*, and clothed with certain defined and limited powers, to enable it to perform those public duties which, according to the laws and usages of the State, are always intrusted to local county tribunals. However chosen, their powers and duties depend upon *the will of the Legislature*, and are modified and changed, and the manner of their appointment regulated, at the pleasure of the State. This corporation, therefore, certainly had no *private* corporate interest in the money; and, indeed, the suit is not entered for their use, but for the use of the county. The claim for the county is equally untenable with that of the Commissioners. The several counties are nothing more than certain portions of territory into which the State is divided for the more convenient exercise of government. They form, together, one political body, in which the sovereignty resides."

In the case of *Perrine* v. *The Chesapeake and Delaware Canal Co.*, (9 Howard, 184) Chief Justice Taney, delivering the opinion of the Supreme Court of the United States, and speaking of corporations generally, says: " The error of this argument consists in regarding the title of the company to the property in question as derived to them upon common priniciples, and measuring their rights by the rules of the common law. The corporation has no rights of property except those derived from the provisions of the charter, nor can it exercise any powers over the property it holds except those with which the charter has clothed it. It holds the property only for the purposes for which it was permitted to acquire it—that is, *to effectuate the objects for which the Legislature created it.*"

In the case of *The Town of East Hartford* v. *The Hartford Bridge Co.*, (10 How. 534) the Supreme Court of the United States says: " The Legislature was acting here on the one point, and *public munci-*

*pal corporations* on the other.  The grantees, likewise—the towns being
mere organizations for public purposes—were liable to have their public
powers, rights and duties *modified or abolished at any moment by the
Legislature.*  They are incorporated for public, and not private objects.
They are allowed to hold privileges *or property only for public purposes.*
The members are not shareholders nor joint partners in any corporate
estate, which they can sell or devise to others, or which can be attached
and levied on for their debts.   Hence, generally, the doings between
them and the Legislature are in the nature of legislation rather than
compact, and subject to all the legislative conditions just named, and,
therefore, to be considered as not violated by subsequent legislative
changes.   It is hardly possible to conceive the grounds on which a
different result could be vindicated, without destroying all the legisla-
tive sovereignty and checking most legislative improvements and
amendments, as well as supervision over its subordinate public bodies.
Thus, to go a little into details, one of the highest attributes and duties
of a Legislature is to regulate public matters with all public bodies, no
less than the community, from time to time, in the manner which the
public welfare may appear to demand.   It can neither devolve these
duties permanently on other public bodies, nor permanently suspend or
abandon them itself, without being usually regarded as unfaithful, and
indeed, attempting what is wholly beyond its constitutional competency.
It is bound also, *to continue to regulate* such public matters and bodies,
as much as to organize them at first.   Where not restrained by some
constitutional provision, this power is inherent in its nature, design and
attitude ; and the community possess as deep and permanent an inter-
est in such power remaining in and being exercised by the Legislature,
when the public progress and welfare demand it, as individuals or cor-
porations can, in any instance, possess in restraining it."

   This legislative recognition of these Alcalde grants may be main-
tained on another ground, which would have the effect of giving them
validity, if originally defective or even void.  Thus, in *Moore* v. *Brown,*
(11 How. 428) C. J. Taney says :  " Undoubtedly, as a general princi-
ple, every one is chargeable with a knowledge of the law, in civil as
well as criminal cases.   This, however, is a legal presumption, which
every one knows has no real foundation in fact, and has been adopted
because it is necessary, as a general rule, for the purposes of justice.
And laws are, therefore, often passed to protect persons who have acted
in good faith, in matters of property, from the consequences of their

ignorance of law.    Thus, *laws confirming defective and void deeds for real property* have frequently been passed in some of the States, and their validity has been recognized by this Court." So, in *Wilkinson* v. *Leland,* (2 Peters, 627) it appears that one Jenkes died in New Hampshire, and his executor sold lands in Rhode Island belonging to the estate to pay debts.    In 1792, the Legislature of Rhode Island passed an act ratifying and confirming the conveyance.    The heirs brought suit, to recover the land, in the United States Court.    The question was taken to the Supreme Court of the United States, in which Court the validity of this act was passed upon.    The Court affirmed the validity of the sale, saying: "It is not an act of confirmation by the owner of the estate, but an act of confirmation of the sale and conveyance by the Legislature, in its sovereign capacity." The case was again before the Supreme Court of the United States.    (10 Pet. 296.) The Court said: "The act of the Legislature and deed are unconditional, and neither the heirs of the devisee nor any other person can impeach the deed by evidence of facts prior to the act of confirmation." Not less strong is the case of *Saterlee* v. *Matthewson,* 2 Peters, 380. That was ejectment for lands in Pennsylvania under a Connecticut title.    The Pennsylvania laws declared these titles, and leases under them, absolutely void.    But, after the first trial, the Legislature passed an act declaring that the relation of landlord and tenant under such titles should be constituted with like effect as in other titles; and this statute was held valid in the Pennsylvania Court and in the Supreme Court of the United States.    The case of *Watson* v. *Mercer* (8 Pet. 88) is still stronger.    There the law made a defective and void deed of conveyance by the wife valid as against her heirs.    The deed was void because the statutory mode of conveyance was not followed.    The Supreme Court of the United States held the act valid.

These authorities—and many more might be cited—show that the Act of the Legislature of 1858, validating these Alcalde grants, is effectual for that purpose; certainly, in the absence of any opposition by the city; and this, whether the Van Ness Ordinance was repealed or not.

It is not necessary, therefore, to consider whether there was any such repealing order passed by the Board of Supervisors as that suggested; or whether the ordinance was in its nature subject to repeal before or in 1858; or whether the Board of Supervisors, under the stringent provisions of the Consolidation Bill, had any power to repeal it; for, in our judgment, the Legislature had the clear right to validate and affirm

these Alcalde grants, and did, by the Act of 1858, so validate and affirm them.

The Court, therefore, did not err to the prejudice of the defendant upon the facts of this case.

2. There can be no question as to the fact that this property was within the limits of the old pueblo. A map of the city was offered in evidence, and though this map is not set out, it is fair to presume it showed the true boundaries and localities, fixing the relation of the lots sued for to the lines of the city. The defendant relied on and introduced the Van Ness Ordinance and the Act of the Legislature of 1858, and claimed that he was within the protection of that ordinance by virtue of his possession; and that ordinance provides for quieting titles to lands within the charter line of 1851; the defendant, of course, asserting that the lots were within that line. There could be no doubt or question, therefore, that the property in dispute was within the limits of the old pueblo, as we have defined those limits to be.

3. It is assigned that the Court erred in refusing to permit defendant to read in evidence a statement of Findla's testimony in another case. The point is not maintainable. This statement was made only for a particular purpose, and was not proof except for that purpose; certainly, was not proof to impeach Findla, who did not make or sign the statement. No authority is cited except the case in 1 Monroe R. 6, which was different in the facts.

4. The question as to the Statute of Limitations is not so presented as that we can revise it. The question was not taken, either as to the admissibility of the evidence, or to the charge when made. It is too late to raise it here now.

Our conclusion is, that upon two distinct and independent grounds, the validity of these Alcalde grants may be safely rested:

1. Upon the title of the pueblo, and the presumed authority of the Alcaldes, as the proper granting officers to grant lots within the pueblo.

2. Upon the Van Ness Ordinance and Act of the Legislature of 1858, which last, in effect, validates and affirms such grants, whether they were or not originally good; or whether the title of the city came by grant to the old pueblo, or had its origin, by presumption or grant, in the Act of Congress.

Judgment affirmed.

COPE, J.—I concur in the judgment of affirmance, and place my con-

currence upon the ground that all the questions in this case have been passed upon and settled by this Court, under such circumstances that we are not at liberty to regard them as open to any further controversy or discussion.

FIELD, C. J.—The plaintiffs deraign their title to the premises in controversy, from two grants issued to Findla by the first Alcalde of San Francisco, on the twenty-first of March, 1850, in pursuance of an order of the Ayuntamiento or Town Council of that place. It appears from the record, that grants had been previously made to Findla by the authorities of the town, and were surrendered in consequence of a want of conformity in the premises with the lines of the city survey, and that the grants in evidence were issued upon such surrender and in consideration thereof. The objection to the introduction of the grants was based upon the absence of proof of title in the grantor, and of power in the Ayuntamiento or Alcalde to make the same. There is no question as to the regularity of the deraignment of title to the plaintiffs; it is upon the efficacy of the grants themselves that the case must be determined, arising from their original validity, or imparted by the provisions of the Van Ness Ordinance and the act of the Legislature ratifying the same.

It was held in the opinion rendered in *Hart* v. *Burnett*, that a pueblo existed at San Francisco at the date of the conquest and cession of California, and that it held the lands within its general limits in trust for certain purposes, and that its Ayuntamiento possessed the power to grant the land to private persons in full ownership. It was also held, in the opinion in that case, that although the political laws which bound the country and its inhabitants to the previous government, were abrogated by the conquest and cession, the municipal laws of the country remained in force until changed by proper authority, and that the subsequent Ayuntamiento could continue to exercise the same power over the pueblo lands, in furtherance of the trust created by those laws, so far as it was not inconsistent with the will, expressed or necessarily implied, of the new government. If the positions thus held are correct, it follows as a necessary consequence that the grants in evidence are presumptively valid. They were issued upon the surrender of grants previously made, for the purpose of correcting an error in the description of the premises. If the original grants were valid, the grants reissued must be held valid, and the presumption is in favor of the val-

idity of the original grants.  The presumption of validity attends every grant issued by parties authorized to grant, when there is nothing on its face impeaching its validity.  It is incumbent on those who contest its validity to support their objections.  The burden of proof rests upon them.  (*Patterson* v. *Jenks et al.* 2 Peters, 225; *Reynolds* v. *West*, 1 Cal. 326.)  The objection to the original grants, that they were not made in furtherance of the trust for which the lands were assigned to the pueblo, is not sustained by any evidence.  Besides, the objection cannot be taken by the defendants.  They do not claim under any conveyance from the authorities of the pueblo; they are strangers to the title, and it is no concern of theirs whether the Ayuntamiento abused its power or not.  If the grants were made improperly—in cases where the laws then in force did not contemplate—it is for the city succeeding to the rights of the pueblo to interfere.  Until such interference, the title must be held good as against third persons.

But admitting that the Ayuntamiento possessed no authority to make grants to individuals after the conquest and treaty of peace, the title of the city passed to the plaintiffs claiming under the grantee, by force of the provisions of the second section of the Van Ness Ordinance, and the act of the Legislature of March 11th, 1858, confirming that ordinance.  By that section the city relinquishes and grants all her right and claim to the lands within the corporate limits, to the parties in the actual possession thereof, by themselves or tenants, on or before the first day of January, A. D. 1855; provided such possession was continued up to the time of the introduction of the ordinance in the Common Council, or, if interrupted by an intruder or trespasser, had been or might be recovered by legal process; and declares that all persons who hold title to lands within said limits, lying east of Larkin street and north-east of Johnston street, by virtue of any grant made by any Ayuntamiento, Town Council or Alcalde of the pueblo after the seventh day of July, 1846, and before the incorporation of the city, which grant, or the material portion thereof, was registered or recorded in a proper book of records, deposited in the office, or custody, or control of the Recorder of the county of San Francisco, on or before April 3d, 1850, shall, for all the purposes contemplated by the ordinance, " be deemed to be the possessors of the land so granted, although the said lands may be in the actual occupancy of persons holding the same adverse to said grantees." The plaintiffs are within the terms of this section.  It is, therefore, of no manner òf consequence whether the Ayuntamiento or Alcalde pos-

sessed any authority to make the grants in question or not. The title of the city passed to the plaintiffs upon the confirmation of the ordinance by the Legislature, if it had never passed previously. The statute enacts, " that the grant of relinquishment of title made by the said city in favor of the several possessors, by sections two and three of the ordinance, * * shall take effect as fully and completely for the purposes of transferring the city's interest, and for all other purposes whatsoever, as if deeds of release and quit-claim had been duly executed and delivered to and in favor of them individually and by name, and no further conveyance or other act shall be necessary to invest the said possessors with all the interest, title, rights, benefits and advantages which the said order and ordinances intend or purport to transfer or convey, according to the true intent and meaning thereof."

It is for these reasons that I concur in the affirmance of the judgment.

On petition for rehearing, FIELD, C. J. delivered the opinion of the Court—BALDWIN, J. concurring.

The defendants apply for a rehearing upon three grounds, which were not noticed in the opinions delivered in this case: 1st. Error in overruling the demurrer to the complaint; 2d. Error in refusing to give the twenty-fifth instruction asked as to the effect of the conveyance of Ranlet, trustee to the plaintiffs, bearing date on the twelfth of October, 1853; and 3d. That the complaint does not support the judgment for the damages recovered for any period preceding the commencement of the action.

The first ground was discussed in the briefs of counsel, and should have been considered in the opinion; for, if sustained, it must lead to a reversal of the judgment. We will now supply the omission and proceed to consider it at length.

The complaint alleges " that the said plaintiffs are the owners in fee as tenants in common, and have the lawful right and are entitled to the possession " of the described premises, and " that the said defendants wrongfully entered upon and are now in the wrongful and unlawful possession of said premises, and wrongfully and unlawfully withhold the possession thereof from said plaintiffs." Then follows the prayer: " Wherefore, the plaintiffs demand judgment that they recover and be put in possession of said premises, and that the defendants pay damages for the unlawful withholding of said premises, and for the rents and profits thereof, in the sum of $3,000."

Payne & Dewey *v.* Treadwell.

To the complaint the defendants demurred, on the ground that it does not state facts sufficient to constitute a cause of action. The demurrer, if we understand it, is also directed to the absence of any allegations as to the damages claimed in the prayer.

The principal objection to the complaint, and the only one urged in the brief of counsel, and in the petition for a rehearing, is that its allegations of title and right of possession in the plaintiffs, and of the wrongful and unlawful possession by the defendants, are not allegations of facts but of conclusions of law.

It is usual to speak of the action to recover the possession of real property as an action of ejectment, and it is possible that with the technical designation it is sometimes thought that some of the technical allegations peculiar to the old form of the action are still necessary. But such is not the case. There is but one form of civil actions in this State, and all the forms of pleadings and the rules by which their sufficiency is to be determined are prescribed by the Practice Act. (See sec. 37.) The complaint must contain "a statement of the facts constituting the cause of action in ordinary and concise language," and it may be verified by the oath of the party, in which case the answer must also be verified. The system in this State requires the facts to be alleged as they exist, and repudiates all fictions. And only such facts need be alleged as are required to be proved, except to negative a possible performance of the obligation which is the basis of the action, or to negative an inference from an act which is in itself indifferent. Now, what facts must be proved to recover in ejectment? These only: that the plaintiff is seized of the premises, or of some estate therein in fee, or for life, or for years, and that the defendant was in their possession at the commencement of the action. The seizin is the fact to be alleged. It is a pleadable and issuable fact, to be established by conveyances from a paramount source of title, or by evidence of prior possession. It is the ultimate fact upon which the claim to recover depends, and it is facts of this character which must be alleged, and not the prior or probative facts which go to establish them. It is the ultimate facts—which could not be struck out of a pleading without leaving it insufficient—and not the evidence of those facts, which must be stated. It is sufficient, therefore, in a complaint in ejectment for the plaintiff to aver in respect to his title, that he is seized of the premises, or of some estate therein in fee, or for life, or for years, according to the fact. The right to the possession follows as a conclusion of law from the seizin, and need not be alleged.

The possession of the defendant is of course a pleadable and issuable fact, and the only question of difficulty arises from the supposed necessity of negativing its possible rightful character. That negative allegations, which are not required to be proved, may in some actions be necessary, may be admitted; but is there any such necessity as to the possession of the defendant in an action of ejectment? It seems to us that the substance of a complaint in ejectment under our practice is this: "A owns certain real property, or some interest in it; the defendant has obtained possession of it, and withholds the possession from him." If the defendant's holding rests upon any existing right, he should be compelled to show it affirmatively, in defense. The right of possession accompanies the ownership, and from the allegation of the fact of ownership—which is the allegation of seizin in "ordinary language"—the right of present possession is presumed as a matter of law. We do not think, therefore, any allegation beyond that of possession by the defendant is necessary, except that he withholds the possession from the plaintiff. The allegation that the possession is "wrongful or unlawful" is not the statement of a fact, but of a conclusion of law. The words are mere surplusage, and though they do not vitiate, they do no good. The withholding of the possession from one who is seized of the premises, is presumptively adverse to his right, and wrongful. It is by force of this presumption that the plaintiff can rest, in the first instance, his case at the trial upon proof of his seizin, and of the possession by the defendant. From these facts, when established, the law implies a right to the present possession in the plaintiff, and a holding adverse to that right in the defendant.

Where the plaintiff has been in possession of the premises for which he sues, it will be sufficient for him to allege in his complaint such possession, and the entry, ouster and continued withholding by the defendant. Such allegations are proper when they correspond with the facts, but they are not essential, as is thought by many members of the Bar. In this State, the possession does not always accompany the legal title. The statute authorizes a sale and conveyance of land held adversely by third persons; and the legal title is frequently held by parties who never had the possession.

In the Courts of New York—and it is well known that the Practice Act was taken principally from the code of procedure of that State—there was at one time some conflict of opinion as to what were sufficient allegations in a complaint in ejectment under the code. It is now, how-

ever, settled by the Supreme Court of that State substantially in accordance with the views we have expressed.   In *Ensign* v. *Sherman*, (14 How. Prac. 439) the plaintiff averred in her complaint that she had lawful title as the owner in fee simple to the real estate in controversy, which was described; that the defendant was in possession of it, and unlawfully withheld possession thereof from her, and on demurrer the complaint was held sufficient.   *Walter* v. *Lockwood* (23 Barb. 228) is to the same effect.

In *Sanders* v. *Leavy* (16 How. Prac. 308) the complaint was similar to the complaint in the cases cited, and was demurred to on the ground that it did not state facts sufficient to constitute a cause of action; because first, it did not allege that the plaintiff or his grantor was ever in possession; and second, it did not allege that such possession was disturbed, and they were evicted by the defendant, his grantors or predecessors.   And it was contended on the argument, as in the case at bar, that the allegations as to the plaintiff's title and the defendant's possession were not averments of facts, but of conclusions of law; but the Court held the complaint sufficient, and gave judgment against the demurrer.   " To recover real estate," said Mr. Justice Ingraham, in delivering the opinion, " what is it necessary for the plaintiff to prove ? Two things: first, that he is the owner of the property ; secondly, that the defendant withholds from him the possession without right.   Both facts are plainly averred in the complaint."   The designation of the withholding of the possession by the defendant, in the cases cited, as unlawful, is not considered as constituting any valid ground of objection.   In *Sanders* v. *Leavy* the attention of the Court was specially directed, in the argument of counsel, to this mode of characterizing the act.   For the reasons we have already stated, we consider it unnecessary to give it any character by special designation ; for, being against one who is seized of the premises, it is presumptively adverse and wrongful. To allege that it is unlawful, is merely to state that which follows under the circumstances as a conclusion of law from the act itself.

The decisions of this Court in respect to the necessary allegations of a complaint in ejectment, have not been uniform, and, perhaps, on no one subject of pleading is there so much embarrassment felt by the profession in consequence.   In *Gladwin et al.* v. *Stebbins* (reported as *Goodwin et al.* v. *Stebbins*, in 2 Cal. 105) the complaint averred that the plaintiffs were " lawfully entitled to the possession of the premises," and the Court held, Mr. Justice Heydenfeldt delivering the opinion, that

the allegation was of a material fact, and therefore sufficient. In this respect we think the opinion cannot be sustained. The averment is clearly a mere statement of a conclusion of law. In *Payne et al.* v. *Treadwell* (5 Cal. 310) the complaint alleged, that the plaintiffs had "lawful title as owners in fee simple of the premises," and " that the defendant is in possession and unlawfully withholds the same ; " and on demurrer the Court held the complaint insufficient. " Notwithstanding," said Chief Justice Murray, in delivering the opinion, " our statute has dispensed with the old form of pleading, and it is no longer necessary to allege a fictitious demise, etc., still, I apprehend that facts sufficient must be pleaded to show the plaintiff's right to recover, and it will not do to state conclusions of law in place thereof. The allegation, that the defendant is in possession, and unlawfully withholds the premises, is insufficient ; it is a conclusion of law drawn from the character of defendant's possession, the circumstances of which should be stated."

The decision, as is apparent, does not relate to the allegation as to the plaintiff's title, notwithstanding the general observations of the Chief Justice ; it applies only to the allegation as to the withholding of the possession by the defendant. So far as this was alleged to have been unlawful, the allegation was of a conclusion of law. But the giving of a certain character to the withholding, as unlawful, did not change the material fact, that the possession was withheld ; and this, as we have seen, taken in connection with the previous allegations of title in the plaintiff, and possession by the defendant, was sufficient. A more particular statement of " the circumstances " of the defendant's possession or withholding, is not necessary under our system of practice. The decision, in this respect, has tended to produce inconvenience to practitioners, and prolixity in pleading, and we have no hesitation in overruling it.

In *Gregory* v. *Haynes et al.* (October term, 1859, No. 2,148) it was held, that the findings by the Court below—that one of the defendants and not the plaintiff was the owner, and entitled to the possession of the property in controversy, and that the defendants did not unlawfully detain the same from the plaintiff—would not support the judgment, and the decision was based upon the ground, that the ownership and right of possession were not facts, in the legal sense of that term, but conclusions of law. We have had great doubt of the correctness of this decision, ever since it was rendered ; and upon the examination which we have given to the subject, in considering the case at bar, we are

Payne & Dewey *v.* Treadwell.

satisfied that we erred, and are glad we have an opportunity, at so early a day, of correcting our error. The fact was found, that one of the defendants was the owner of the premises in controversy, and that fact alone was sufficient to support the judgment against the plaintiff, nothing else having been found to qualify the right to the possession which accompanies the title. The balance of the findings might have been treated as surplusage. The claim of the plaintiff having been thus disposed of, it was unnecessary to find as to the character of the defendants' detention of the premises.

In *Boles* v. *Johnston et al.* (January term, 1860) the opinion states that the substantial averments of the complaint were only that the plaintiffs were the owners of the property in question, and that the defendant was in possession of it. It does not state that there was any averment that the possession was withheld from the plaintiff. If such averment were in fact made in the complaint, the decision cannot be sustained.

It follows, from the views we have expressed, that the complaint in the case at bar is sufficient. It avers that the plaintiffs are the owners in fee, as tenants in common, of the premises; that the defendants are in possession of the same, and withhold the possession thereof from the plaintiffs. Whatever is alleged beyond these averments is immaterial, and may be stricken out. The facts essential to a good complaint are stated, and the additional allegation of lawful right and title in the plaintiff, and the designation of "wrongful" and "unlawful" applied to the possession and withholding of the defendant, though unnecessary, do not vitiate the pleading; and the demurrer was properly overruled.

The second ground upon which a rehearing is asked, was not taken on the argument or in any of the briefs of counsel. It is too late to urge it now for the first time, after the case has been fully considered upon the points to which the attention of the Court was called, and a decision has been rendered.

The third ground urged for a rehearing was also not presented before, and is now taken in the petition for the first time. The objection taken on the argument was to the alleged error of the Court in the charge to the jury, and the admission of evidence as to the value of the use and occupation of the premises from October 12th, 1853; and the point of the objection was, that a recovery for such use and occupation beyond three years was barred by the Statute of Limitations; and we held that the point was not so presented by the record that we

could consider it. It is undoubtedly true that, under the complaint, damages for any period preceding the commencement of the action cannot be recovered. Where such damages are claimed, the complaint must state the title of the plaintiff as existing at some prior date, (to be designated) and as continuing up to the commencement of the action, and the entry of the defendant at some date subsequent to that of the alleged title. In the present case, we have no means of determining the manner in which the damages were made up by the jury, or whether any damages for the period preceding the commencement of the action were found. According to the testimony of one of the witnesses, Middleton, the value of the rents for the period intervening the commencement of the action and the trial, exceeded the amount of the verdict. The objection to his testimony was too general to be regarded. It states no ground, and we have frequently decided that to entitle an objection to the admission of evidence to notice, its point must be particularly stated. (*Kiler* v. *Kimball*, 10 Cal. 267; *Covillaud* v. *Tanner*, 7 Cal. 38; Practice Act, sec. 189.) No specific exception was taken to the charge of the Judge on the subject of damages. The general exception to all the charge, followed by a specification of the portions to which the exception was particularly directed, did not cover errors not designated at the time.

Rehearing denied.

COPE, J.—I dissent from the conclusion of the Court upon the first question presented in the opinion of the Chief Justice.