[No. 1661.]

## DANIEL POWELL, RESPONDENT, *v.* NEVADA, CALIFORNIA AND OREGON RAILWAY, A CORPORATION, APPELLANT.

RAILROADS—OPERATION OF SHOPS—FRIGHTENING HORSES—LIABILITY FOR PERSONAL INJURIES—EVIDENCE—EXCESSIVE DAMAGES—QUESTION FOR JURY—NEGLIGENCE—STEAM WHISTLE—APPEAL—REHEARING—STATUTE ENACTED AFTER HEARING.

1.  There is no fixed rule for the measure of damages for personal injuries, especially for mental anguish apart from physical suffering, and much must be left to the jury under proper instructions.

2.  While, in an action for personal injuries, testimony for defendant tended to minimize his injuries, there was evidence that plaintiff's fall caused a concussion of the brain and an atrophic condition of the muscles of the right arm, that his mental faculties became impaired, and he was dull and appeared distracted, and one witness described his condition as pitiful. *Held*, that a verdict for $6,000 was not so excessive as to indicate passion or prejudice.

3.  In an action for personal injuries caused by a fall from a cart when plaintiff's horse was frightened by a steam whistle in defendant's railroad shops, evidence that a team had been frightened thereby on another occasion was admissible to show the dangerous character of the whistle at the place it was used.

4.  Questions addressed to master mechanics as to whether it was necessary and convenient for defendant to sound the whistle at stated hours to notify employees in the shops to commence and quit work were properly excluded, as they related to a subject of common knowledge and experience.

5.  In an action for personal injuries caused by a fall from a cart, resulting from plaintiff's horse being frightened by a steam whistle in defendant's railroad shops, an instruction that there is a distinction between the nature of a locomotive whistle and a stationary whistle for the purpose of notice only; the former being necessary for the purpose of frightening animals off the track, etc., so that its usefulness depends on the alarming and frightening character of the noise it makes, while with respect to the latter there is no necessity for constructing or operating them so as to alarm an animal of ordinary gentleness, so that any unnecessary alarming or frightening use of them is wrongful, was proper.

6.  The power of railroad companies under Comp. Laws, sec. 988, subd. 10, "to erect and maintain all necessary and convenient buildings, stations, depots, and fixtures and machinery for the accommodation and use of their passengers, freight and business," etc., does not protect a company in such a use of a steam whistle in its shops as to frighten horses and thereby injure others.

7.  Questions not raised on the original hearing will not be considered on the rehearing.

8. If the judgment of the district court and opinion on appeal were correct at the time they were made, they cannot be invalidated on rehearing by a statute passed subsequently, even if, for the purposes of the argument, its constitutionality be conceded. It is manifest that the rehearing was not granted for that purpose.

9. If a judgment was correct at the time it was rendered, and was properly affirmed at the time it was passed upon by the supreme court, the propriety of its decision cannot be affected on rehearing by a statute passed after the decision on appeal.

PETITION for rehearing by appellant upon the Supreme Court affirming the judgment of the District Court. **Petition denied. Original opinion affirmed.** [For former opinion, see page 40 of this volume.]

The facts sufficiently appear in the opinion.

*Dodge, Parker & Arnold*, and *Cheney, Massey & Smith*, for Appellant and Petitioner:

I. *The evidence is insufficient to justify the verdict, which is excessive, and contrary to law.* The appellate court, in determining the questions here presented as to the insufficiency of the evidence, should weigh the evidence taken altogether, and, even if there be substantial conflicts therein, should render its decision in accordance with the fair preponderance thereof.

The history of legislation with regard to the retrial of causes in Nevada clearly shows that the people of this state, as represented in their legislature, have come, with increasing enlightenment, more and more to favor careful and searching consideration, by the appellate court, of questions as to the miscarriage of justice in the trial courts.

Thus, the statute in force prior to 1893—that is, sections 195 and 196 of the act of March 8, 1869 (see pp. 345 and 348 of the compilation of 1873)—provided that insufficiency of the evidence to justify the verdict or other decision should be ground upon which to base a motion for a new trial, and that "when the notice designates, as the ground upon which the motion will be made, the insufficiency of the evidence to justify the verdict or other decision, the statement shall specify the particulars in which such evidence is alleged to be insufficient." The expression "insufficiency of the evi-

dence" or "not supported by the evidence" is equivalent to
the expression "against the weight of evidence" ( *Wilson* v.
*Eau Claire*, 89 Wis. 47), and, under the provisions of the act of
1869, it was, of course, the duty of the trial court, upon a
motion for a new trial, to consider and weigh the evidence
taken altogether to determine where the preponderance
thereof lay. (14 Ency. of Pl. & Pr. 769–771.) Inasmuch,
however, as the act of 1869 was silent as to what evidence
should be considered by the appellate court in rendering its
decisions upon appeals from orders of the trial courts deny-
ing motions for new trials, the appellate court was bound by
the well-established general rule that, upon appeal, it might
not weigh the evidence, but that, if there were a substantial
conflict in the evidence—that is, if there were any substantial
evidence tending to justify the verdict or other decision
below—then it might not disturb the order of the lower
court, even though the evidence, taken altogether, did not
seem to the appellate court to justify such order. For the
general rule see 14 Ency. of Pl. & Pr. 770.

See, also, *Welland* v. *Williams*, 21 Nev. 230: "There was
a substantial conflict in the evidence, * * * and, even if
not satisfied with the finding, this prevents us from looking
into the evidence for the purpose of determining where its
weight lies."

And see *Pinschower* v. *Hanks*, 18 Nev. 103; *State* v. *Yellow
Jacket Co.*, 5 Nev. 415; *Treadway* v. *Wilder*, 9 Nev. 67; *Mar-
garoli* v. *Milligan*, 11 Nev. 96; *Carlyon* v. *Lannan*, 4 Nev.
156; *Quint* v. *M. Co.*, 4 Nev. 304; *Reed* v. *Reed*, 4 Nev. 395;
*Covington* v. *Becker*, 5 Nev. 281.

It is, of course, hardly necessary to recall to this court the
general rules that it followed, under the act of 1869, in ren-
dering decisions on appeals from orders denying motions for
new trials, when such motions were based on points as to the
insufficiency of the evidence. It may be well, however, to
point out that the said act, therein differing diametrically
from the act now in force, expressly provided that the speci-
fications of error upon appeal from an order denying a motion
for a new trial on the ground of insufficiency of the evidence
must designate each particular relied upon to establish the

contention that the said evidence was insufficient, hence that no particular not so specified would be considered by the appellate court. For the general rule in this regard see 2 Ency. of Pl. & Pr. 428–431.

See, also, *Warren* v. *Quill*, 9 Nev. 259, 264; *Solomon* v. *Fuller*, 14 Nev. 63; *Champion* v. *Sessions*, 2 Nev. 273; *Nosler* v. *Haynes*, 2 Nev. 55; *Mining Co.* v. *Mining Co.*, 4 Nev. 414; *Mitchell* v. *Bromberger*, 2 Nev. 345.

Also, it may be well to recall to this court that, under the act of 1869, if the record contained no evidence or finding whatever as to an issue material to a verdict or other decision in favor of the successful party, it must nevertheless be presumed that such issue had actually been found, by the trial court, in favor of the successful party. For the general rule in this regard see 2 Ency. of Pl. & Pr. 432–433.

See, also, *More* v. *Lott*, 13 Nev. 376, 380; *Champion* v. *Sessions*, 2 Nev. 273.

II.   It is not suggested that the said rules formerly observed by this court were not proper under the act of 1869—indeed, as indicated above, they are the well-established rules generally observed in other jurisdictions where acts similar to that of 1869 are still in force, and are in accord with the presumption that judicial tribunals act according to the law, and that, therefore, every fact essential to the regularity of proceedings below may be presumed to have been regularly shown, unless the record shows error, and shows such error affirmatively. The said rules have here been reviewed merely for the purpose of emphasizing the changes therein brought about by the amendment of 1893. The act of 1893 (Comp. Laws, 3292) amended the act of 1869 by omitting the words "the statement shall specify the particulars in which such evidence is alleged to be insufficient," and by adding the provisions following:   "It shall be a sufficient assignment of error to specify that the verdict of the jury, or the decision, or judgment, or decree of the court, is not supported by the evidence, or is contrary to the evidence. In such case, where it appears that the evidence, *taken altogether*, does not support the verdict, or decision, or judgment, or decree of the court, a new trial should be granted, or, *upon appeal*, the

case shall be reversed *without regard to whether there are express findings of fact upon all the issues, or whether the specifications particularly point out the finding or findings, either express or implied, that are not supported by the evidence, or are contrary thereto.*" The change here made in the previously existing law is radical, but also it is very clearly expressed. The point to which the attention of this court is particularly directed is the change as to the duties of this court upon appeal from an order denying a motion for a new trial, when such motion is based on a point as to the insufficiency of the evidence.

III.   By the amendment of 1893 the trial court is expressly directed to consider the evidence, taken altogether, and if, taken altogether, such evidence be insufficient, then the trial court shall grant a new trial, otherwise the "case shall be reversed" by the appellate court; that is, "upon appeal," the case shall be reversed unless it appears that the evidence, taken altogether, does not support the verdict, or other decision. The necessary implication, in fact the expressed direction, contained in the amendment of 1893, is that the appellate court shall weigh all the evidence upon an appeal from an order denying a new trial, for the reversal of the case by the appellate court is made the alternative of the granting of a new trial by the trial court, in any case where it appears that the evidence, taken altogether, is insufficient to support the verdict, or other decision. That the intendment of the amendment of 1893 is that the appellate court shall consider and weigh all the evidence, is further and conclusively shown in that the said amendment provides that "upon appeal" this court shall no longer apply certain of the presumptions which, under the act of 1869, used to operate in favor of the regularity of the proceedings below, for it is expressly enacted that this court shall not have regard as to whether or not "there are express findings upon all the issues"; that is, the fact that there is no finding upon a material issue no longer raises a presumption that such issue was duly found for the successful party below. Again, in contradistinction to alleged errors of law, which, under the new law, must still be particularly specified, or else be disregarded, it is enacted that

erroneous findings of fact need not be expressly specified in the statement, but, whether so specified or not, are to be considered by this court.

Arguments might be multiplied to show the intendment of the amendment of 1893 to be that this court, upon appeal from an order denying a new trial, shall weigh all the evidence, but it would seem sufficient, in itself, merely to invoke the well-established rules that, when the wording of a statute is changed, some change in the operation of the statute must be presumed to have been intended (26 Am. & Eng. Ency. 625, 649), and that, in interpreting statutes, courts of law must seek to give meaning and effect to every word; no matter may be excluded, as surplusage, to which any reasonable meaning can be attached; a construction which would leave without effect any part of the language used in the statute must be rejected if any interpretation of such language can be found which will give it effect. (*State* v. *Parkinson*, 5 Nev. 19; *Dulton* v. *Shelton*, 3 Cal. 206; 26 Am. & Eng. Ency. 618, 619.)   On examination of the amendment of 1893, in the light of these rules of interpretation, it appears that the express provision of the amendment to the effect that the consideration of evidence shall be of the evidence taken altogether would be mere surplusage and of no effect unless made applicable to the consideration of the evidence by the appellate court, for, as pointed out above, it is the duty of the trial court to weigh the evidence taken altogether, even in the absence of express legislation to that effect.   (14 Ency. of Pl. & Pr. 769: "Duties and Functions of Trial Court as to Weight of Evidence," and cases cited under that heading.)

In *Watt* v. *N. C. R. R. Co.*, 23 Nev. 171, 172, it was said: "The duty of the supreme court to look into the evidence and grant a new trial 'in cases where it appears that the evidence taken altogether does not support the verdict or decision or judgment of the court,' is made clear by Stats. 1893, p. 88, as authoritatively construed in *Beck* v. *Thompson*, 22 Nev. 121. In that case the court, while recognizing the rule applicable in case of conflict of evidence as given above, said:   'As already remarked, this statute (1893) has worked

an important and quite radical change, and in a proper case, without regard to whether there are or are not findings, seems to impose upon this court the duty of reviewing the evidence, and determining whether the final result is supported by it. This statute was undoubtedly designed to cut through many technicalities that have so often prevented cases from being considered upon their merits, and should be construed in the same broad spirit in which it was enacted, but at the same time with such conservatism as will not result in the reversal of a case where substantial justice has been done. * * * Where there is a substantial conflict in the testimony, the appellate court should undoubtedly not substitute its judgment for that of the trial court, and should only interfere where, upon all the evidence, it is clear that a wrong conclusion has been reached.'"

IV. Not satisfied even with the sweeping changes wrought, by the amendment of 1893, in the law regulating the consideration of evidence by the appellate court, the legislature of this state, during its recently adjourned session, still further amended the act of 1869 by reënacting the amendment of 1893, and by adding thereto the still more specific direction that the appellate court shall reverse "the case" when it appears that the evidence taken altogether, does not, "*by a fair preponderance,*" support the verdict or other decision below. (Stats. 1905, chap. 21.)

Regard being had to the above-mentioned rules of interpretation, it is submitted that this amendment of 1905 has cleared the path of the appellate court of the last obstacle standing in the way of its consideration of cases wholly upon their merits. The long-established rule that this court will not disturb verdicts, or other decisions below, when there is a substantial conflict in the evidence, is at last abrogated. The express direction that this court is to reverse any finding which does not appear to be supported "by a fair preponderance" of the evidence must mean that, when there are substantial or other conflicts in the evidence, the conflicting parts of such evidence are to be weighed, the one against the other, and that a decision is to be made in accordance with that part of the conflicting evidence which is the stronger.

This is the meaning of the amendment of 1905, or the said amendment means nothing.

V. It is in accordance with the provisions of this last amendment that this court is called upon to determine the questions here presented.

"Statutes which are designed to change the mode of judicial procedure, where such change relates to the method of enforcing a right and does not affect the right itself, are construed to apply to causes of action which accrued before enactment as well as to those to accrue thereafter. And such statutes are generally held to apply also to actions pending at the time of enactment, in the absence of a saving clause." (26 Am. & Eng. Ency. 695.)

"The legislature can change a rule of practice making the change applicable to all cases brought before or after the passage of the act" (citing cases). And "where there is no saving clause as to existing legislation in a repealing act which provides a new procedure, all rights of action will be enforced under the new procedure, without regard to whether suit had been instituted or not" (citing cases). (6 Am. & Eng. Ency. 950, note 2.) "There is no vested right in a rule of evidence, and, as such rules affect only the remedy, it is within the constitutional power of the legislature to modify them." (Id. 950.) For other authorities see another brief filed herewith.

VI. A fair preponderance of the evidence, taken altogether, does not justify the verdict, for a fair preponderance thereof does not establish the contention of the plaintiff as to the mental anguish suffered by the plaintiff.

It is not suggested that, in cases based on physical injuries, it is necessary to establish mental anguish, or mental suffering, by evidence specifically directed to that end; on the contrary, it is conceded that, where severe physical injury is proved, mental suffering may be regarded as inseparably connected therewith, and that juries may presume or infer mental suffering from severe physical injury, without direct proof that such suffering was undergone (Hale on Damages, note on p. 95; 8 Am. & Eng. Ency. 659, note 2). But since evidence affirmatively to establish mental suffering, even

though unnecessary, may properly be adduced (*Telegraph Co.* v. *Adams*, 75 Tex. 531), it seems equally clear that the presumption of mental suffering resulting from physical injury may properly be overcome by positive evidence to the contrary. It is confidently asserted, furthermore, that the evidence positively establishes the fact that the plaintiff in this case suffered no mental suffering. Mental suffering, though it may be presumed from physical suffering, is, of course, to be distinguished therefrom. If, for example, a man is thrown from a cart, and his arm is thereby permanently injured, the fright which he underwent at the time of the accident, as well as the pain of the thought that he has been crippled or disfigured for life, is quite distinct from the physical pain induced by the injury itself.

Even the primary, or basic, question as to whether or not mental suffering, in actions based on physical injuries, should be taken into consideration, under any circumstances whatever, is one upon which the courts of the various states have split (Hale on Damages, 92–93). In most of the states, however, it has been established that damages for mental suffering may be assessed in actions based on injuries to the person. In some of the states in which this view is held the damages for mental suffering have been restricted to the fright undergone by the complainant "at the time of the occurrence of the injury."

"Where damages have been allowed for mental pain as an element of damage distinct from bodily suffering, it will be found that it was for mental agony at the time of the accident." (*Johnson* v. *Wells, Fargo & Co.*, 6 Nev. 236, and see cases cited on p. 231.)

In other states the doctrine of damages for mental suffering, in actions based on physical injuries, has been extended to include suffering occasioned by the thought of permanent injury, where the injury is actually permanent (8 Am. & Eng. Ency. 660, 664.)

Now, in the case in hand, it is submitted that, even under the rules obtaining in those jurisdictions which are most liberal in allowing compensatory damages for mental suffering in actions based on physical injuries, the testimony not only

fails to show that this plaintiff underwent any mental suffering, but even positively established that he underwent no mental suffering.

The only testimony to be considered with a view to determining whether or not the plaintiff underwent any mental suffering is to the effect:

(*a*) That the suddenness with which the plaintiff was thrown from his cart, "at the time of the occurrence of the injury," was such that there was no time to experience fright, and that he did not, in fact, experience any fright at that time.

The plaintiff's own testimony in this regard is as follows: "Drove right through the whirlwind.   Q. Now, what is the next thing that you remember after that?   A. Well, that is about the last thing that I remember.   Well, after I got about a hundred yards from it (the railroad crossing); I guess that is about the last thing that I know of.   I do not recollect of being thrown out of the cart at all."   Certainly there is no evidence here to show such fright, apprehension, or terror and alarm at the prospect of the threatened danger as has been held, in some jurisdictions, to form a basis for damages for mental suffering.   (8 Am. & Eng. Ency. 666.)

(*b*) That the plaintiff did not suffer great physical pain, and therefore, even if mental suffering be indeed a necessary incident to physical suffering, that mental suffering may not be presumed.   "I wasn't in much pain," said the plaintiff; and his nurse, Mrs. Wentworth, testified to the same effect: "He suffered very little, or complained of suffering very little, for he was in a dazed condition."

(*c*) That the plaintiff did not suffer mental anguish based on the permanency of his injury, for he said:   "I thought I was going to get well pretty soon.   Well, it (his arm) seemed to improve a while, and the last month or two it don't seem to improve at all any more.   If it is warm, why it feels better.   If it is cold, why it is dumb—numb—can't use it."

Inasmuch, therefore, as the evidence affirmatively shows that the plaintiff underwent no such mental suffering as is taken cognizance of in law, it is submitted that this plaintiff is entitled to no damages whatever for mental suffering.

At this point it is desired to call the attention of the court to a matter which, it is submitted, is unanswerable to show that a new trial should be granted on the ground of excessive and improperly found damages. The said matter is one purely of mathematical calculation. The total amount in which the complaint demands for physical injuries is $5,000. The amount of the verdict is $6,000. The amount in which damages are demanded for medical attendance is $89.50. Thus, if it be held that the jury contemplated granting the total amount of damages demanded for physical injuries, and also the total amount demanded for medical attendance, there would still remain a surplus of $910.50, which amount, at least, must necessarily, therefore, have been granted under the plaintiff's demand for damages for "acute and long-continued mental anguish and physical suffering."

VII.   But not only is it shown on the face of the complaint itself that the verdict is excessive, but, on the same evidence, it is shown that the verdict is contrary to law, for it necessarily appears therefrom that at least $910.50 was allowed as damages for mental suffering separate and distinct from bodily suffering.

In this connection it is important to bear in mind the fact that this court recognizes the well-established distinction between damages for mental suffering in actions based upon physical injuries, and damages for mental suffering in actions based upon such torts as assault, false imprisonment, slander, libel, breach of promise, failure to deliver telegrams, and the like, where injury to the feelings, as distinguished from injuries to the body, is the real or main injury complained of.

In the case of *Johnson* v. *Wells, Fargo & Co.*, 6 Nev. 224, it was definitely established, as the rule to obtain in this jurisdiction, that, in actions for physical injuries, mental suffering may never be assessed as an element of damage separate and distinct from bodily suffering.   In *Barnes* v. *Western Union Tel. Co.*, 27 Nev. 438, it was as definitely established, as the rule to obtain in this jurisdiction, that, in actions for failure to deliver telegrams, and the like, where the main injury caused by the tort complained of is injury to the feelings, mental suffering may be assessed as an element of dam-

age distinct from the pecuniary loss occasioned by the wrong. That the court in the Barnes case did not mean to overrule the Johnson case is clearly shown in that the latter case was not even mentioned in the former. The distinction thus established in this jurisdiction between actions based on injuries to the body and those based on injuries to the feelings is one very generally recognized by the authorities. (*Young* v. *Western Union Tel. Co.*, 9 L. R. A. 669.)

VIII. After an exhaustive discussion of the authorities bearing on the question of damages for mental suffering in actions based upon physical injuries, the court in the Johnson case, as stated above, established the rule to govern in this state to be that mental suffering in such cases may not be considered as a distinct element of damages. In that case the judgment below was reversed by this court on the ground that, in instructing the jurymen as to what matters they might consider in their assessment of damages, the trial judge erred in directing them to take into consideration the plaintiff's "pain of mind." The holding in that case, in this regard, is, therefore, definite, and is controlling in the case in hand. In *Johnson* v. *Wells, Fargo & Co.*, however, it was said: "The law is well settled that in an action like the present a plaintiff may recover for bodily suffering; though, were it a new question, it may well be doubted whether any satisfactory reason could be given for the rule."

If it be true that bodily suffering may not be considered as a separate and distinct element of damage, then that part of the complaint which asks the court so to consider it is as void as that part which asks the court to consider mental suffering as a distinct element of damage, and the total amount of the plaintiff's demand for damages, apart from disbursements for medical attendance, must be held to have been only $5,000. This question, however, is here immaterial, for the reason that, as pointed out above, the only evidence on the subject is wholly to the effect that the plaintiff did not suffer physical agony. The evidence being as it is, it is unnecessary even to invoke the rule stated by the statutes of 1893 and 1905, discussed above, to the effect that, upon appeal, this court may not presume an issue essential to

the plaintiff's recovery to have been found in the plaintiff's favor by the trial court, for, as already stated, there is evidence directly on this point, and said evidence is not even conflicting, but is wholly to the effect that the plaintiff's injuries did not cause him physical suffering.   Inasmuch, therefore, as the plaintiff was not entitled to damages for physical suffering, the conclusion is irresistible that at least $910.50 was awarded by the jury as damages for mental suffering.

IX.   As to the comparison of the mental condition of the plaintiff before the accident with his mental condition afterward, the evidence is conflicting.   The witness Kinney testified that, after the accident, the plaintiff "was a very different man"; that "he acted like a man who was demented, losing his mind."   It was shown, however, that this witness had not seen much of him for the three years preceding the trial, and had met him during that time only occasionally; also it was shown that this witness could not say whether or not the plaintiff's mind had deteriorated prior to the accident.   Upon this showing counsel for the defendant objected to the introduction of the testimony of this witness on the ground that the effect it might have upon the jury would be in disproportion to its value as evidence, and over this objection, though without exception taken, this testimony was admitted.   The witness O'Connor testified as follows: "Well, I consider that ever since he has been a different man to what he was before. I never heard his memory or mind in question; never heard of its being noticed as being any different from most men. In fact, I always thought he was a little sharper than I was. I do not know whether he was or not, but I always thought he was."   The plaintiff's brother testified that, prior to the accident: "As far as I noticed him he seemed to be all right enough.   Of course, he was not probably as quick mentally as when he was younger, but then he was all right"; and that, since the accident, "he has been pretty weak-minded; his memory was not good at all.   Can't remember anything scarcely any length of time."   The testimony of this witness on cross-examination has already been considered.   The witness Little testified that he is "not the man he was before the accident"; that "he don't seem to recollect anything

when you are talking"; that before the accident "I never noticed anything wrong with him," but that "he is getting older all the time," and that he couldn't say when he first noticed any difference in the plaintiff's mental condition; that he had not noticed the change at "any particular time."

It is noticeable that the foregoing is the only testimony, except Pollock's, elicited by the plaintiff's attorney on questions as to a comparison of the mental condition of the plaintiff some considerable time before the accident with his mental condition a reasonable time after the accident.

In sharp contrast to the foregoing is the testimony of Pollock, a witness called by the plaintiff. It was shown that Pollock had known the plaintiff intimately, both before and after the accident. On his direct examination by counsel for the plaintiff, the witness Pollock testified as follows: Up to the time of the accident, with reference to his memory and his conduct of business affairs, the mental condition of the plaintiff seemed to be "all right," but that he could not say as to whether his memory was as good immediately prior to the accident as it had been in former years; that the plaintiff's memory might not have been as good in 1902, at the time of the filing of his petition in bankruptcy, as it had been previously; that since the accident "his memory seems to be rather poor," but the coherency of his conversation was "all right" after the accident.

X. It is submitted that the mental wanderings of the plaintiff while he was in the hospital—that is, before he was discharged from the hospital by his attending physician (a period of a little less than two weeks)—is comparatively unimportant. Considerable testimony, however, was introduced to show that, during the said two weeks, the plaintiff wandered in his mind, and was quite incoherent in his talk. Yet even on this point there is a strong conflict in the testimony, for his attending physician, Dr. Gibson, called by the defendant, testified as follows: When the plaintiff was taken to the hospital, immediately after the accident, "I talked with him"; his conversation was "coherent" and responsive to the questions asked; he was not semi-conscious "because he answered all questions intelligently and slowly,

nor did it irritate him to ask him questions; the next
morning his talk was rational."

*Severity of the plaintiff's physical injuries:*   The evidence
shows that the plaintiff suffered two physical injuries:   (*a*)
a blow on the head, and (*b*) an injury to the right arm.
Counsel for the plaintiff sought to show that the blow on the
head was sufficient to derange the plaintiff's mind, and that
the blow on the arm was sufficient permanently to cripple it.
In this connection it is suggested that any jar to the head,
however slight, produces what is technically known to the
medical profession as a concussion of the brain.

(*b*)  *The injury to the arm:*   The preponderance of the evi-
dence on this point is undoubtedly to the effect that, in being
thrown from his cart, the plaintiff suffered an injury to his
right arm, which injury produced a slightly atrophied, or
wasted, condition of the said arm not to be wholly accounted
for by the atrophy of old age.   That the said slightly atro-
phied condition of the right arm, however, does not cause the
plaintiff physical pain, and is not, in itself, very serious to a
man of the plaintiff's age, clearly appears.

(*c*)  *In general:*   There is a good deal of evidence to the
effect that, during the two weeks that the plaintiff was under
medical care, he was somewhat flighty and deranged in mind.
It further appears, however, according to Mrs. Wentworth's
testimony, that he was not even confined to his bed:  "This
man was able to walk about all the while.   Physically he
seemed well, except that arm.   He would get up and walk
about and look about.   He was not confined to his bed.   We
could not keep him in bed.   That was one trouble."   That,
within less than three days after the plaintiff had been taken
to Mrs. Wentworth's private hospital, Mrs. Wentworth moved
all her patients to the general hospital, and at that time,
while the other patients were transferred in hacks and busses,
etc., this plaintiff was well enough to be driven to the gen-
eral hospital by Mrs. Wentworth herself in a buggy, and to
hold a conversation with Mrs. Wentworth on the way, and
"that, before the expiration of a full fortnight, Dr. Gibson
having visited him only six times, he was discharged by Dr.
Gibson because he did not need further medical attendance."

All the evidence on the subject is to the effect that the plaintiff had always been a slight, spare man. The witness O'Connor testified: "Anybody that knew Powell fifteen, or even twenty, years ago would know him now."

It is submitted that, considered in the light of all the corroborative evidence on this point, the plaintiff's own admission that his physical injuries did not amount to much is of some weight. "Do you remember whether or not any portions of your body were injured?" he was asked by his own counsel. "Oh, some," he replied, "but then not materially. In fact, so far as that got—of course, they was hurt some, but not very materially."

XI. Upon the showing made above it is submitted that the verdict for $6,000 was so greatly in excess of proper compensatory damages for injuries, such as the preponderance of the evidence shows to have been suffered by the plaintiff, as clearly to establish that the nine jurors who made this finding did so under the influence of passion or prejudice.

In this connection is expressly applicable the well-established rule that, in assessing compensatory damages for permanent physical injuries, greater compensation may be allowed to a young, vigorous man, with a long life and earning capacity before him, than to an aged man who has already outlasted his physical and mental vigor, and whose life is drawing to a close. (13 Cyc. 142.) It is submitted that the jury did not consider, in the cold light of reason, what effect the age of the plaintiff should have upon its award of compensatory damages, and did not find its verdict upon a calm, unimpassioned consideration of the testimony, but that, on the contrary, the age of the plaintiff created a prejudice in his favor, and inflamed the minds of the jurors with an active sympathy which should not have been expressed in their findings.

XII. *Nature of the sound produced by the whistle:* It is undoubtedly the law, as indicated in defendant's instructions and in the opinion rendered by this court on the first hearing of this appeal, that, provided the steam whistle on the defendant's shops was not constructed or used, so far as concerns the rights of others, in an unreasonable or negligent manner,

the defendant's right to maintain said steam whistle upon its said shops must.be conceded.   And further, in accordance with the well-worn rule that he who alleges negligence must prove negligence, no presumption of negligence arises upon proof of the bald fact that the blowing of the defendant's whistle, by causing plaintiff's horse to run away, caused injury to the plaintiff.   An issue essential to the plaintiff's recovery of damages in this case, then, is affirmative proof that the plaintiff's runaway, caused by the blowing of the defendant's whistle, was due to the fact that, on the particular occasion in question, the said whistle was blown negligently. Now, under the statutory rule discussed at the beginning of this argument this court may not presume this essential issue to have been found in favor of the plaintiff by the trial court, but must weigh the evidence, taken altogether, to ascertain whether or not a preponderance of the evidence in fact sustains the finding.

The only negligence charged by the plaintiff against the defendant, as causing the runaway, is that the steam whistle. in question was improperly connected with the boiler, wherefore, in sounding the whistle, clouds of steam were necessarily discharged through the sides of the building on which the whistle was placed, and also that the said whistle was of "excessive, unusual, and unnecessary shrillness, loudness, harshness, and discordance."   It is unnecessary to consider the first of these charges.   It was absolutely disproved. What the plaintiff took to be leakage from the whistle was in fact a discharge from an exhaust pipe leading under the north side of the building, and had nothing whatever to do with the whistle.   The negligence charged against the defendant, then, reduces itself to this, that, on the particular occasion in question, the said whistle was blown with "excessive and unnecessary shrillness, loudness, harshness, and discordance," which resolves itself simply into a question as to the nature of the sound of the said whistle.

The testimony on the question is as follows:  The witness Frandsen testified that this whistle was louder than any other whistle he had ever heard, a statement that, in the light of the evidence that this was an ordinary railroad whistle, and

in the light of common sense, was, on its face, so grossly exaggerated as to show bias on the part of the witness. This same witness testified that the sound of the whistle was very loud and penetrating, so much so that he himself had often been startled by it, but admitted, on cross-examination, that this may have been because he lived within little more than 160 feet of it. The witness Fogg testified that "there wasn't any whistle [in his neighborhood] that was so loud and shrill and rasping as this one was. Consequently when it started all conversation ceased that was going on around us. We could not hear one another without speaking in a very loud tone. We *generally* waited until the whistle stopped. That is the only explanation I can give of it." It is submitted that this is not very strong evidence to show the whistle to have had an unusual sound, especially in view of his other testimony to the effect that he lived within about 160 feet of this whistle, much nearer than to other whistles in his neighborhood, and that the reason that conversation ceased when the whistle began was because the witness thought "it is better to stop than to have to talk in a way-out tone of voice, and not know whether you would be understood." Moreover, there is affirmative evidence by this witness that he did not consider the quality of the tone of this whistle to be shrill, for, in describing the variations in tone produced by various whistles, he testified that "some have a shrill sound and some have a roar," and that the sound produced by this whistle was a "roar." The witness Robert Smith testified, in response to the leading question as to how the whistle sounded "with reference to shrillness, or anything of that kind," that "it sounded pretty loud, shrill, something like a ferry-boat whistle." It is suggested that few whistles are so variously toned as ferry-boat whistles, being purposely given readily distinguishable tones, so that in fogs the boats to which they are attached may be identified by the navigators of other boats.

XIII. *Frightening of the plaintiff's horse:* In the absence of affirmative evidence proving negligence on the part of the defendant, the question as to whether or not the plaintiff's horse was actually frightened by the blowing of the defend-

ant's whistle is, as has already been argued, immaterial.   It
appears, however, that the evidence is not clear even as to
this secondary question.

The witness Robert Smith, who was driving with the plain-
tiff at the time of the accident, testified the "horse was all
right until we got to where the whistle blowed.   When the
whistle blowed, she wheeled around short, and that is where
he got thrown out."   Later this witness testified that the
horse swung, and threw the plaintiff out of the cart "just
exactly when it commenced to whistle and the steam came
out."   This would seem to argue that the few seconds which
must necessarily elapse before a horse gets completely out of
his driver's control must have elapsed before the whistle
began to blow.   Indeed, this witness laid less stress on the
theory that the mare was frightened by the sound of the
whistle than on the theory that she was frightened by the
sight of the steam, which, he testified, blew across the road,
the latter theory being the more plausible in view of the
fact, to be discussed later, that the mare was apt to shy at a
bit of paper blown across the road.   Thus, he said "When
we got about 50 or 60 yards from the railroad crossing the
whistle blowed and the steam came out, blowed half across
the road"; the steam was "right at the west end" of the
power house.   He testified further, under questions upon
cross-examination, that the steam came from the west end
of the building, not more than three feet from the ground,
turned the southwest corner of the building, and went half
way across the street.   Now, in the first place, it may be
pointed out that the complaint alleges no negligence against
the defendant in that it maintained a steam exhaust pipe,
but only that steam escaped from defective connections in
the whistling apparatus, and therefore that no evidence as
to negligence in maintaining a steam exhaust is competent,
and, in the second place, that it is manifestly impossible that
the statements made by this witness as to the steam can
be true.   The evidence is positive to the effect, as already
discussed, that no steam ever escaped from the whistle
connections.

The plaintiff testified that he "drove right through the

whirlwind." In this the plaintiff was corroborated by no other witness, but was contradicted both by Robert Smith, who testified that "Mr. Powell pulled the horse around"; he did not drive through the whirlwind; and by the witness Hutchinson, who testified that the cart "turned out." The plaintiff did not remember having heard the whistle after he passed the whirlwind, and the witness Hutchinson testified as follows: "Q. Did you hear any sounds about that time, between the time you saw the horse pass the house going east and then when next you saw it running back? A. No, sir." It was from his house, which was just about opposite the whistle, that this witness saw plaintiff's horse pass and repass. The whistle in question had been blown four times a day for about three years before the accident. The plaintiff frequently traveled Fourth Street to get to his home at Glendale. There was no testimony offered to show that this horse had ever before been frightened by this whistle.

Upon this showing it is submitted not only that the preponderance of the evidence fails to show any negligence on the part of the defendant, but even that it is not clear that the plaintiff's horse was frightened by the blowing of the defendant's whistle, wherefore the verdict is contrary to law.

XIV. *There were errors in law occurring at the trial, which errors were excepted to by the defendant.* The errors in law occurring at the trial, to which the attention of this court is especially directed, were (*a*) the admission of the testimony of the witness Eason, and (*b*) the giving of plaintiff's instruction No. 10.

(*a*) *The admission of the testimony of the witness Eason:* It must be conceded that there is much authority to the contrary of the general rule that admission of evidence of *res inter alios acta* is improper. Some of the reasons upon which the said general rule is based are well stated in *Phillips* v. *Willow*, 70 Wis. 6, 5 Am. St. Rep. 114. It was there said: "To hold such testimony admissible would be to open the door to numerous and perplexing side issues, which is always to be avoided. Issues would be made not raised by the pleadings, and which presumably neither party would be prepared to try. It must be admitted that the cases are not in accord

upon this question.  It is apparent that if this testimony was
relevant it would also have been relevant to show that hun-
dreds had passed over this highway in safety with carriages,
notwithstanding the alleged defect.  So, issue after issue
would be raised, and facts collateral to the issue made by the
pleadings would multiply; the main issue forming new ones,
and the suit itself expanding like the banyan tree of India,
whose branches drop shoots to the ground, which take root
and form new stocks, till the tree itself covers great space by
its circumference.  We think it a much safer rule to confine
the evidence to the issue or real fact put in controversy by
the pleadings."

As stated above, however, it is conceded that there is much
authority to the contrary of the *res inter alios acta* rule, and
that, in actions for damages for injuries resulting from neg-
ligence, evidence of other injuries resulting from the same
cause has often, by eminent authorities, been held to be
admissible.  That such evidence is essentially dangerous as
tending to divert the attention of the jury from the issues
raised by the pleadings, and that, therefore, such evidence
should be admitted, if at all, only with great caution, has
already been argued upon the first hearing of this appeal.
It is here again contended that, though evidence of *res inter
alios acta* may be proper in some cases, it should never be
admitted in cases concerning the frightening of horses.  It
is, however, earnestly desired that the court should not
misunderstand the defendant's main contention upon this
rehearing to be against the propriety of the *res inter alios
acta* rule as applied to this case.  On the contrary it may be
conceded, for purposes of argument only, that if a proper
foundation therefor had first been laid, the admission of the
testimony of the witness Eason would not have been error,
yet, even conceding this, it is confidently asserted that the said
testimony was not properly admitted because the necessary
foundation therefor had not been laid.

The rule admitting *res inter alios acta* evidence is modified
by another rule, namely, that even though evidence be some-
what relevant to the matter in issue, it is nevertheless inad-
missible if it be of such a nature that its probable effect

upon the jury will be in disproportion to its value as evidence, and in this connection it is submitted that in all the best considered cases in which *res inter alios acta* evidence has been admitted convincing proof has been required, before the admission of the evidence, that the conditions under which the prior happening occurred were substantially the same as the condition under which the happening in question occurred, "but to render such evidence competent, it must appear, or at least the evidence must necessarily tend to show, that the instrument or agency whose condition is in issue was in substantially the same condition at such times as it was at the time when the accident complained of occurred." (*Morse* v. *Minn. Ry. Co.*, 30 Minn. 465, 16 N. W. 358, 361.)

Now, at the time when the witness Eason was permitted to testify, not only was there no evidence before the court to show that the sound of the whistle was the same at the time of Eason's runaway as it was at the time of the plaintiff's runaway, but, on the contrary, the only evidence before the court in this regard was to the effect that this whistle "did not have the same sound all the time." In this connection it is to be borne in mind that the nature of the sound of the whistle was the main, in fact virtually the only, ground on which the plaintiff sought to establish negligence against the defendant; that the witness Fogg had testified that sometimes this whistle was blown "without much steam"—a point to be considered in the light of the later contention of counsel for the plaintiff that it is well known that "the tones of whistles are moderated and regulated and varied by the pressure of steam"; and that the witness Frandsen had testified that "sometimes they would change the whistle, give it a different sound." From this it clearly appears that a foundation for the admission of Eason's testimony had not been laid—rather that a foundation had been laid for its exclusion. In admitting Eason's testimony it is believed that the trial court had under consideration the case of *Hill* v. *Portland R. Co.*, 55 Me. 438, 92 Am. Dec. 601. In that case testimony was admitted to show that horses other than the plaintiff's had been frightened by a certain whistle. It cannot be pre-

sumed, however, that the evidence before the trial court in
that case was to the effect that the particular whistle in
question sounded differently at different times.

The tendency of the trial court to admit evidence of this
character, upon improper foundation, is illustrated in the
admission of the testimony of the witness Lucas. This wit-
ness had testified that his horse was frightened by any and
all kinds of whistles, and therefore proof that the said horse
had been frightened by the defendant's whistle was not in
any way competent to show the defendant's whistle to have
been of a negligently dangerous character, yet Mr. Lucas was
permitted to testify that his horse had once run away upon
hearing the defendant's whistle. It is true, upon proof that
another whistle had been sounded at the same time, and that
the witness could not tell which whistle it was that had
frightened his horse, that the said testimony was stricken
out. It must, however, have had an undue effect upon the
jury.

(b) *Plaintiff's Instruction No. 10:*   This instruction, it is
submitted, almost amounted to a direction of a verdict for
the plaintiff; it fairly bristles with implied findings of fact,
the finding of which was strictly within the province of the
jury, not of the court. Thus, for example, the jury was
instructed that one of the purposes for which locomotive
whistles are used is, specifically, to frighten horses. "The use-
fulness of the (locomotive) whistle," it was stated, "depends
upon the alarming and frightening character of the noise it
makes, and one of the purposes for which it is used is to
frighten and alarm." Now, in view of the fact that the
whistle in question had been shown to be an ordinary loco-
motive whistle, it is clear that this instruction amounted to
a statement that the whistle in question was of a frightening
and alarming character. The very point in issue—the only
point on which the plaintiff could hope to show negligence
on the part of the defendant—was as to whether or not the
sound of this whistle was such as to "frighten and alarm."

It may be pointed out that no testimony was offered on the
trial, and there was no evidence in the case of any kind, to
show that locomotive whistles are necessarily of an "alarm-

ing and frightening character," yet this vital point was given to the jury as a rule of law by which it was to be bound. It is hard to conceive that courts of law could come to recognize a legal presumption to the effect that locomotive whistles are specially designed to "frighten and alarm." Indeed, in *Hill* v. *Portland R. Co., supra*, the court said: "The whistle seems particularly adapted to give notice of the approach of a train to a crossing of a highway. The object, then, is to warn all persons of such approach in season to enable them to stop at a safe distance, and thus avoid the risk of alarm to horses."

Let it be supposed, for example, that the accident sued upon in the case in hand had been occasioned by the blowing of a whistle on one of the defendant's locomotives. Can it be supposed, in such event, that no proof would have been required to show that the sound produced by such whistle was in fact of a nature to frighten a gentle horse? Can it be supposed that, in the face of evidence introduced to show a contrary fact, the court might have instructed the jury that a legal presumption operated to establish that the sound of such whistle, since the whistle was on a locomotive, was in fact of a nature to "frighten and alarm" the horse? These questions are answered by the case of *Hill* v. *Portland R. Co., supra*. In that case a horse had been frightened by a locomotive whistle sounded on a locomotive which was standing at a crossing. The whistle was sounded as a signal that the train was about to start. The court said: "It would seem that there may be a decided difference in 'whistles' in their suddenness, loudness, and brevity, and consequently in their liability to alarm horses." (92 Am. Dec. 603.) "It was competent to show the jury  *  *  *  the characteristics of the sound emitted, and its effects on horses of ordinary steadiness." Specific proof, therefore, was necessary to show that the nature of the sound produced by the particular locomotive whistle concerned in that case was such as would frighten an ordinarily gentle horse. Specific proof of said fact would hardly have been necessary if a legal presumption had operated to establish it.

The discussion herein is not made in ignorance of the fact that the language of the instruction criticized is, in parts,

copied verbatim from the opinion of the court in *Knight* v. *Rubber Co.*, 38 Conn. 438, 9 Am. Rep. 406, 408.   In that case it is stated, as the opinion of the court, that "the usefulness of the locomotive whistle depends upon the alarming and frightening character of the noise it makes, and one of the purposes for which it is used is to frighten and alarm. * * * But the rule should be different in respect to whistles used upon factories."   It may be pointed out, however, that the court in that case did not state its opinion in this regard to be one generally recognized by courts of law.   In fact, *Knight* v. *Rubber Co.* is an isolated case which cites no authorities. The opinion is dissented from by one judge, another judge being absent.   Furthermore, the nature of the sound produced by locomotive whistles was not involved in the Knight case, the remarks of the court thereon being mere expressions of opinion.   It need hardly be pointed out that such *ex cathedra* remarks by one appellate court, in reviewing testimony, can hardly be construed as establishing presumptions of law, and are remarks not properly to be made by a trial judge to a jury.

After having found a presumption of law to the effect that locomotive whistles are especially constructed with a view to producing a sound of "an alarming and frightening character," plaintiff's instruction No. 10 goes on to find that stationary whistles are necessarily of a different construction and of a different character.   "But," the said instruction reads, "the rule is different in respect to stationary whistles intended for notice only, and that if used if there is no necessity for constructing or operating them in such a way as to alarm or frighten any person or animal of ordinary gentleness, any unnecessary alarming or frightening use of them, if productive of injury to another, is wrongful, and the proprietors should be holden responsible for the injury."

This part of the instruction is objectionable. on various grounds.   In the first place, it implies that the law draws a distinction between the unnecessary and negligent use of whistles on locomotives and the unnecessary and negligent use of whistles on stationary objects; that, in the latter case, but not in the former, damages may be found.   That this is

not law hardly needs to be shown by the citation of some of
the many cases in which damages have been recovered,
against railroad companies, for injuries resulting from the
frightening of horses by the unnecessary and negligent
blowing of locomotive whistles.    (*Hill* v. *Portland R. Co.*,
*supra; R. R.* v. *Box* (Tex.) 17 S. W. 375; *Weil* v. *R. R.* (Ark )
9 Am. & Eng. R. R. Cas. 721: "The sound of the second
whistle was peculiar and extraordinary"; *Ochiltree* v. *R. R.*
(Iowa) 9 Am. & Eng. R. R. Cas. 30: "It was because of
these short, sharp blasts from the whistle that the team was
frightened"; *Everett* v. *R. R.* (N. C.) 8 Am. & Eng. R. R.
Cas. 523; *R. R.* v. *Barnett*, 59 Pa. St. 259; *Bittle* v. *R. R.*
(N. J.) 23 L. R. A. 283: "Never heard a shriller whistle.
It was a great deal louder than the usual whistle.    The legal
right to blow the whistle may be conceded, yet it does not
by any means follow that this right could be exercised in a
negligent manner.    The question here is whether this whistle
was so negligently blown as to have caused injury to the
plaintiff," citing many cases; *Mitchell* v. *R. R.* (Tenn.) 40
L. R. A. 426.)    And see, for many other cases, note on
"Frightening Horses," in 5 Am. & Eng. R. R. Cas. 283.

*S. Summerfield*, for Respondent:

I.    Fundamentally a rehearing is what the ordinary signi-
fication of the word itself implies.    It is a hearing again of
the same questions which were fairly presented upon the
original hearing.    Questions which were not raised on the
original hearing will not be considered on a rehearing.
(*Republic Ins. Co.* v. *Swigert*, 135 Ill. 150; *Schafer* v. *Schafer*,
93 Ind. 586; *Manor* v. *Jay County*, 137 Ind. 367; *Tubbesing*
v. *Burlington*, 68 Iowa, 691; *Goodenow* v. *Litchfield*, 59 Iowa,
226; *Minneapolis Trust Co.* v. *Eastman*, 47 Minn. 301; *Cham-
berlain* v. *Northeastern R. Co.*, 41 S. C. 399; *Mount* v. *Mitch-
ell*, 32 N. Y. 702; *Kellogg* v. *Cochran*, 87 Cal. 192; *San
Francisco* v. *Pacific Bank*, 89 Cal. 223; *Marine Bank* v.
*National Bank*, 59 N. Y. 73; *Giant Powder Co.* v. *California
Powder Co.*, 5 Fed. 197; *Railway Mfg. Co.* v. *North Hudson
R. Co.*, 26 Fed. 411.)    The fact that the last two cases cited
involved rehearings in equity cases in nowise affects the gen-

eral principle in view.   No suggestion whatever was made
at the original hearing that it was the duty of this court to
weigh the evidence in the case with the object of determining
the preponderance thereof.   It was urged that the evidence
taken altogether was not sufficient to support the verdict and
judgment, but that contention was necessarily subordinate to
the well-established rules governing the consideration of
evidence in this court at the time the decision was rendered.

II.   The amendment to the practice act approved February
25, 1905, besides being judicially iconoclastic and inherently
vicious, is unconstitutional, null, and void.   It is violative of
the requirements of section 17 of article IV of the constitu-
tion of the State of Nevada.   The provision of the organic
law of this state, above cited, requires that "each law enacted
by the legislature shall embrace but one subject, and matter
properly connected therewith, which subject shall be briefly
expressed in the title."   The title of the act approved Feb-
ruary 25, 1905, restrictively declares it to be "An act amend-
atory of an act entitled 'An act to regulate proceedings in
civil cases in the courts of justice of this state, and to repeal
all other acts in relation thereto,' approved March 8, 1869."
(Stats. 1905, 33, *et seq.*)   It is convincingly apparent that the
real act to be amended was section 1 of "An act to amend
an act entitled 'An act to regulate proceedings in civil cases
in the courts of justice of this state, and to repeal all other
acts in relation thereto,' approved March 8, 1869," approved
March 6, 1893.   Section 197 of the act of March 8, 1869, the
one purporting to be amended by the act of February 25,
1905, was not in existence when the latter act was passed,
but had been entirely superseded by section 1 of the act
approved March 6, 1893.

As above noted the title of the act approved February 25,
1905, is restricted to a purported amendment of the act
approved March 8, 1869, and cannot be extended to the
amendment of other sections of other acts.   (*Ex parte Hew-
lett*, 22 Nev. 333.)   It may be contended that a statute reën-
acting a former statute, and simply providing that certain
sections thereof shall be amended "so as to read as follows,"
reënacts all contained in the original act, and that there is

no hiatus in the force and effect of the original act and of the amendatory act reënacting the original act. If such contention is made, it is probably supported by the weight of authority. The contention, however, if made, fails to sustain appellant's position in this case.

III. Omitting inconsequential verbal changes without legal import or effect, the act of March 6, 1893, omitted from the act of March 8, 1869, the following words: "The statement shall specify the particulars in which such evidence is alleged to be insufficient," and superseded the same with the following words: "It shall be a sufficient assignment of error to specify that the verdict of the jury, or the decision, or judgment, or decree of the court, is not supported by the evidence, or is contrary to the evidence. In such case where it appears that the evidence, taken altogether, does not support the verdict, or decision, or judgment, or decree of the court, a new trial shall be granted, or, upon appeal, the case shall be reversed without regard to whether there are express findings upon all the issues, or whether the specifications particularly point out the finding or findings, either express or implied, that are not supported by the evidence, or are contrary thereto." There can be no doubt but that the broadest possible intendment of the act of March 6, 1893, was to simplify the procedure relative to the degree of particularity required in assignments of errors based upon the evidence and to emphasize the duty of the appellate court to reverse judgments where there is no evidence, taking the evidence altogether, to support the verdict. This, however, was in nowise suggestive of a duty imposed upon the appellate court to balance the scales and determine upon which side, in its opinion, the preponderance of evidence prevailed.

There is no avoiding the conclusion that the act of February 25, 1905, in so far as it interpolated new matter in the practice act, was germane only to the act of March 6, 1893, and was wholly ungermane to the act approved March 8, 1869.

"The form in which amendments, both of the code and of the revised statutes, have generally been made by declaring that particular sections shall be amended so as to read in a given way, was adopted for the purpose of adjusting them to

the original enactments, so that when the system should, after repeated amendments, become complete, the different parts might be put together without further revision, and thus form a perfect code.  The portions of the amended sections which are merely copied without change are not to be considered as repealed and again enacted, but to have been the law all along; *and the new parts, or the changed portions, are not to be taken to have been the law at any time prior to the passage of the amended act."*  (*Ely* v. *Holton*, 15 N. Y. 598; *C. P. R. R. Co.* v. *Shackelford*, 63 Cal. 261.)

IV.   The act of February 25, 1905, is violative of section 1 of article III and of section 4 of article VI of the constitution of the State of Nevada.  By section 1 of article III of the constitution of the State of Nevada, the powers of government are divided into the legislative, the executive, and the judicial branches and no persons charged with the exercise of powers properly belonging to one of these departments shall exercise any functions appertaining to either of the others, except as provided in the constitution.  Under section 4 of article VI of the constitution of Nevada it is provided that "the supreme court shall have appellate jurisdiction  *  *  *  in all cases at law in which  *  *  *  the value of the property in controversy exceeds three hundred dollars."  It will be observed that the jurisdiction of the supreme court in cases of the character of the one now under consideration by the organic act is made strictly *appellate.* It could not have meant that the trial court and the jury were simply referees before whom the testimony should be taken preliminary to its being reported to the supreme court to weigh the same, determine its preponderance, and render judgment accordingly.   The word *appellate* had a well-recognized meaning at the time of the adoption of the constitution, as much so as did the words "the right of trial by jury shall be secured to all and remain inviolate forever" meant a trial by jury of twelve persons, as was declared by this court in *State* v. *McClear*, 11 Nev. 39, *et seq.*

The statute of March 6, 1893, embraced all of the provisions of antecedent laws relating to the subject of the consideration of evidence by the supreme court and repealed all

statutes on that subject thereby revised without any express provision to that effect. (*State* v. *Rogers*, 10 Nev. 322; *Thorpe* v. *Schooling*, 7 Nev. 15.) Notwithstanding the fact that the constitution of the State of Nevada does not expressly inhibit retrospective laws, yet it is submitted that such laws are disfavored by the courts irrespective of whether such constitutional inhibition exists or not. (*Ely* v. *Holton*, 15 N. Y. 595; *Satterlee* v. *Matthewson*, 2 Pet. (S. C.) 380; *Oriental Bank* v. *Freese*, 18 Me. 109; *Wires* v. *Farr*, 25 Vt. 41; *Plumb* v. *Lawyer*, 21 Conn. 351; *Garrett* v. *Beaumont*, 24 Miss. 377; *Trustees* v. *McKaughey*, 22 Ohio St. 142; *Central Trust Co.* v. *Sheffield Co.*, 60 Fed. 16; *Patterson* v. *Philbrook*, 9 Mass. 151.)

V. Instruction No. 10 closely follows the decision of the Supreme Court of Connecticut in *Knight* v. *Goodyear Co.*, 38 Conn. 442, 9 Am. Rep. 406, which case is closely analogous to the facts in this case, and if counsel for appellant are able to find any case so nearly approximating the facts in this case as that last cited, their industry will supply that which counsel for respondent has been unable to find.

The law does distinguish the necessary nature and construction of a locomotive whistle, used as such, and a mere stationary whistle. Taking into consideration the danger of operating trains and locomotives, and of which a whistle is an integral part, it imposes upon the operators thereof many duties and requirements not at all applicable to the use of whistles stationary in character and merely intended for notice.

"But independent of the custom and the statute we are clearly of the opinion that it is the duty of a railroad company at all times, when moving its locomotives or trains through the public streets of a city, to give some signal of their approach. To move its locomotives or cars through the streets at night, or on dark, stormy, and windy days, without giving any signal, would be gross negligence." (*Solen* v. *V. & T. R. R. Co.*, 13 Nev. 122.)

"This high measure of duty on the part of the railroad company, the statute, prescribing notices by sign-boards at road or street crossings, the ringing of the bell or the blow-

ing of the whistle, has not relaxed in any degree.   As a rule of duty it stands as stringent and inflexible, founded in common law and the plainest right, as if there were no such statute.   Compliance with the statute is, of course, one of the circumstances under which they run their trains; and, incidentally, such compliance may make it consistent with due care and caution to do what, without using such signals, would, even if there were no such statutes, be negligence. But the rule stands and the statute stands with it; both must be satisfied.   And hence, it is properly said, the statute does not constitute the sole rule of duty.   The common law still requires the exercise of care and prudence in the running of their ponderous engines and heavy trains through an inhabited country; and that care and prudence increases in degree as they enter towns, villages, and cities and cross their thoroughfares."   (*Grippen* v. *N. Y. R. Co.*, 40 N. Y. 42.)

Appellant apparently rests in the belief that the statutes alone prescribe the degree of care and precaution required of railroad companies in the mechanism, location, and operation of their whistles and mechanical contrivances.   This is far from the truth for the reason as indicated in the foregoing citation.   The common law in all respects where not inconsistent with express statutes must be observed by the courts as a rule of decision.

"But even if we should concede that the instruction was to some extent inapplicable to the facts, it would not necessarily follow that the judgment should be reversed; certainly not, if it is apparent from a consideration of all the instructions that the jury could not have been misled thereby." (*Bunting* v. *C. P. R. R. Co.*, 16 Nev. 286.)

In all earnestness it is submitted that neither the law, the facts, nor the ingenuity of counsel for appellant have disclosed substantial reasons why the verdict of the jury, the judgment of the court thereon, the order of court denying a new trial, and the original opinion of this court should be overthrown upon this rehearing.

*Cheney & Massey*, for Appellant and Petitioner, in reply:

I.   There is no merit in the claim of respondent that the

statute of 1905, directing the supreme court to grant a new trial when the evidence fairly preponderates against the decision or verdict, is unconstitutional because it invades the province of the jury. It has long been the law of this state that it is the duty of the trial judge to set aside a verdict if the weight of the evidence is against it. (*Phillpotts* v. *Blasdel*, 8 Nev. 61; *Solen* v. *V. & T. R. R. Co.*, 13 Nev. 107; *Albion M. Co.* v. *Richmond M. Co.*, 19 Nev. 231.)

The reason of the rule that the trial judge should weigh the evidence and ascertain upon which side the preponderance lies and the appellate court could not was stated to be found in the better opportunities of the trial court to determine the credibility of the witnesses. But the province of the jury was invaded just as much when the trial judge set aside a verdict as if the supreme court had done so. If it is solely the province of the jury to weigh the evidence, then it is immaterial what tribunal reverses the jury's action because its decision is contrary to the weight of the evidence. The constitution gives the right to a jury trial, but it does not and could not give a right to a mistrial by a jury. The law must ever determine whether there has been a mistrial.

But the rule has prevailed when the reason ceased. It has been held that the same rule applies when a motion for a new trial is decided by a judge other than the one who tried the case. (*Welland* v. *Williams*, 21 Nev. 230.)

II. We do not controvert the proposition that statutes are not to be given a retroactive effect unless an intention is manifested that they shall be so construed. But we are not seeking to give the act of 1905 any retroactive operation. That amendment provided a rule of decision for this court to be thereafter applied. We are seeking to have it applied in this court now, after, not before, the passage of the act. The principal case relied upon by respondent states the rule aptly. When *Ely* v. *Holton* was before the Supreme Court of New York its decision in that case was final. That court decided the case definitely and finally. Subsequently the legislature gave a right of appeal in that class of actions. Thereafter an appeal was taken in that cause, and the court said: "The case had been determined by the court of last resort in such

cases, according to the arrangements of the law then in force. Then the legislature intervenes by declaring that judgments in that class of cases are subject to another review. But they are not to be understood by this to refer to cases where the litigation has been ended, but to actions thereafter to be prosecuted, *and to such as were then pending and undetermined.*" (*Ely* v. *Holton*, 15 N. Y. 595, 600.)

There is one decision of this court apparently adverse to our contention, which we think, in fairness, should be brought to its attention. In *Poujade* v. *Ryan*, 21 Nev. 449, 451, the amendment of the practice act in question of 1893 was brought to the attention of the court and claimed to have an application to a statement on motion for a new trial made before the passage of the act. The court said: "It is further urged that the amendment to the practice act (Stats. 1893, p. 88) has changed this rule, but, without pausing to determine whether that is or is not the case, it is sufficient here to say that the amendment is not retroactive, and does not apply where the motion for a new trial has been made and disposed of before its passage. (*Hancock* v. *Thom*, 46 Cal. 643; *Caulfield* v. *Doe*, 45 Cal. 222.)"

We think it may fairly be said that Judge Bigelow, in making that statement not only did not pause to consider whether the statute had changed the rule, but he did not pause and consider whether the authorities which he cited sustained the law which he declared. The most cursory examination of the two cases cited from California would have shown that they had no application whatever, because the code of California, which was under consideration in each of these cases, expressly provided that the code should not apply to actions pending at the time of its adoption, and the same rule was applied to amendments to the code as to the code itself. The very fact that the judge fell into this error shows that the point was not considered necessary to determine the case, or in fact considered at all.

III.   Counsel in his argument has said much respecting the restrictive character of the title amending section 197 of the civil practice act (Comp. Laws, 3292).

We fail to see anything restrictive in the title. On the

contrary, it seems to be general. If there had been included in the title language restricting the amendment to section 197, and the legislature under such an amendment had enacted separate and distinct sections thereto, the argument of counsel would have made the case cited from this court applicable to the act in controversy. There being no restrictive language used in the title, and the title to the original act passed in 1869 being general, and the amendment being germane to that general title, counsel's contention must necessarily fail. It is a rule of law, well supported by authority in states having a constitutional provision similar to ours, that it is not important that the title of an amendatory act shall do any more than recite the title or substance of the act amended, provided the amendment is germane to the subject of the original act and is embraced within the title of such amended act. (*Hyman* v. *State*, 87 Tenn. 109; *Brandon* v. *State*, 16 Ind. 197; *People* v. *Parvin*, 74 Cal. 549.)

The following titles have been held sufficient: "An act to add an additional article to the code of public laws, to be entitled 'Garrett County'" (*State* v. *Fox*, 51 Md. 412). "An act to amend the several acts incorporating the Town of Lawrenceville" (*Bagwell* v. *Lawrenceville*, 21 S. E. 903). And, even though the title of the amendatory act declares that it is to amend a specific section or other subdivision, when there is no such section or subdivision, the title will be treated as sufficient, by disregarding as surplusage the designation of such subdivision or section and treating the title as though merely declaring the act to be one to amend the code in question. (*State* v. *Robinson*, 32 Or. 43.)

The subject of titles proposing amendments to general or revised statutes is very thoroughly treated in the note to the case of *Crookstown* v. *County Commissioners*, 79 Am. St. Rep. 480–485, in which note there has been collected a large number of authorities, all of which sustain the contention of the appellant in this case. As a matter of law the title of an original act or the title of an amendatory act is valid if it is sufficient to indicate the subject-matter of the act itself, and, if the subject-matter is germane either to the title of the gen-

eral act or the amendatory act, the courts have invariably held such acts to be valid.

*Dodge, Parker & Arnold*, for Appellant and Petitioner, in reply:

I.   There can be no doubt as to the meaning of the act of 1905.   When the language of a statute is clear its letter must prevail; if the language admits of but one meaning, there is no room for construction.   The act of 1905 expressly states that "the case shall be reversed," "upon appeal," if it appears to this court that the decision below is not supported "by a fair preponderance" of all the evidence.   That this court, on this rehearing (as has already been fully argued in our prior briefs herein), is bound by the provisions of the act of 1905, notwithstanding that the said act became law subsequent to the original hearing herein, is equally clear.   The argument of respondent, accordingly, is chiefly directed to calling into question the constitutionality of the act of 1905.   It is true that this court will not pass upon constitutional questions except where absolutely necessary to the proper disposition of a case.   (*State* v. *Curler*, 26 Nev. 347.)   It is true, also, that we have urged that the preponderance of the evidence in this case is so strong against the verdict that a new trial should be granted, even under the provisions of the act of 1893, therefore that a determination of a question as to the constitutionality of the act of 1905 is here unnecessary.   But the question having been raised, we are constrained to discuss it.

It is argued by respondent that the effect of the amendment of 1905 is a usurpation by the legislative branch of our government of the functions of our judiciary.   The said amendment is merely an enlargement of the judicial functions of this court by broadening the rules of evidence under which it is to render its decisions.   It is hardly supposable that counsel for respondent seriously contends that our legislature has not power to regulate the jurisdiction of the state courts, and to enact laws establishing rules of evidence to be observed therein, yet it is hard otherwise to account

for counsel's contention. The act in question, so far as any interference with the functions of this court is concerned, actually enlarges its powers. It is an act which enlarges the powers of this court for the purpose of remedying an existing law which operated mischievously, and such an act should be liberally construed. *Larkin* v. *Saffarans*, 15 Fed. 149, 150: "The first obvious suggestion here is, can the statute, in conferring jurisdiction over suits then pending, be said to act retrospectively in any proper sense? It acts immediately on a thing then in existence, and from that moment gives the court a power to act on that thing. * * * And it will be found that, both in the civil and common law, the repugnance to retrospective legislation was not understood to extend to remedial legislation of that character. * * * This is only in accordance with the general rule that all remedial legislation shall be liberally construed, and particularly should this be so * * * with reference to the bestowal of jurisdiction on the courts." See, also, *Bissell Co.* v. *Goshen Co.*, 72 Fed. 545, 553.

II. If it was unconstitutional in the legislature of 1905 to enact that this court shall reverse verdicts not supported by a "preponderance" of the evidence, then it was unconstitutional in the legislature of 1893 to enact that this court should reverse verdicts not supported by the evidence "taken altogether"—yet, in many years, it has not been held that the act of 1893 was unconstitutional. It is argued, further, that the act of 1905 is void in that the title of the said act recites that it is amendatory of the act of 1889, whereas the last-named act has not been in existence since 1893, at which time it was repealed by the act of that year. That is, if the act of 1905 had been entitled: An act to amend an act entitled "An act to amend an act entitled," etc., instead of being entitled: "An act amendatory of an act entitled," etc., counsel would have found no objection. Being entitled as it is, however, counsel urges that a "just and reasonable conclusion is that the legislature and the executive were misled by grossly falsifying the title of the bill." That this contention has no merit is not only self-apparent, but it is even admitted by necessary implication from counsel's own statements. "It is

convincingly apparent," he states, "that the real act sought to be amended" was the act of 1893. If this is true, then the clear intention of the legislature must be given effect. Precisely the same question raised here was raised in *Reynolds* v. *Board of Education* (Kan. 1903, 72 Pac. 274, 276). In that case an act passed in 1879 purported to amend an act passed in 1868 which had already been repealed by a prior amendment. The court said: "It is further urged that the act of 1879 cannot stand, because the title is insufficient. If the law of 1868 had not been repealed, no doubt whatever would exist that the title sufficiently expressed the subject of the act, and such repeal cannot render that subject any more indefinite."

III. Thus it appears that the constitutional provision that statutes shall be so entitled as briefly to denote the subject of legislation, is intended to safeguard those who read the title from being misled as to the substance of the act, and does not find its purpose in defeating legislation on highly technical grounds. That the clear intention of the legislature was to amend the act of 1869 as amended in 1893 is apparent from the fact that the amendment of 1905 follows the language of the amendment of 1893 as to all provisions not contained in the act of 1869, and changes said amendment only by inserting the words "by a fair preponderance." (*Wilkinson* v. *Ketler*, 59 Ala. 306; *Allison* v. *Corker*, 67 N. J. L. 601; *White* v. *Inebriates' Home*, 141 N. Y. 123, 35 N. E. 1092; *Brigel* v. *Starbuck*, 34 Ohio St. 280; *Kamerick* v. *Castleman*, 21 Mo. App. 590.)

IV. With regard to plaintiff's instruction No. 10, counsel for respondent reiterates his assertion that the general remarks of a Connecticut court concerning locomotive whistles, which remarks were not germane to the issue in the case in which they were uttered, but were mere dicta, and which were not supported by the citation of any authority whatever, not even of Connecticut authority, have established a presumption of law, operative in this state, practically to the effect that it is negligence *per se* to maintain locomotive whistles on factories. Our objections to the said instruction, as indicated in our former briefs, may be formu-

lated as follows: Plaintiff's instruction No. 10 is improper because (1) it invades the province of the jury in that it finds, as matters of ·fact, directly or indirectly, that the sound produced by a locomotive whistle is of an "alarming and frightening" character, and also that the construction of proper stationary whistles is different from the construction of locomotive whistles; (2) in both of these regards, also, it assumes material facts controverted by the defendant; (3) in the first of these regards, further, it assumes the existence of a fact not in evidence, there being no testimony offered in court to show that locomotive whistles are intended to frighten and alarm; (4) in the second of these regards it assumes the existence of a fact which the evidence shows, or tends to show, does not exist; (5) it misstates the law in that it implies that the law knows a distinction between the negligent use of locomotive whistles, and the negligent use of stationary whistles; and (6) it is involved, ambiguous, and argumentative.

By the Court, TALBOT, J.:

The decision of this court herein was rendered December 24, 1904 (see page 40 of this volume). A petition for rehearing was filed January 23, 1905. The order granting the rehearing did not limit the purposes for which the rehearing might be had, although the main inducement for granting one was the statement in the petition that this court had omitted to particularly consider in its opinion plaintiff's instruction No. 10, the giving of which to the jury is said by the appellant to be the basis of one of its main assertions that the district court erred. The briefs and the arguments on rehearing, presented last April and May, covered the contentions previously advanced and more, and have gone beyond the petition itself, and further than the questions involved on the appeal.

It is now urged that under the statute approved February 25, 1905, p. 33, c. 21, purporting to amend section 197 of the civil practice act, and which was passed after the determination of the appeal and after the filing and granting of the petition for rehearing, this court ought to remand the case,

because it does not appear that the judgment is supported by a fair preponderance of the evidence. In opposing this contention . the validity of the amendment is assailed by respondent. As indicated in the opinion, the evidence is ample to support the verdict under the statute as it stood before the passage of this late act. Following the usual precedent, the constitutional questions advanced by counsel will not be considered, when their adjudication is not necessary for a proper determination of the cause.

The attorney for respondent asserts that questions which were not raised on the original hearing will not be considered on rehearing, and cites the following cases so holding: *Schafer* v. *Schafer*, 93 Ind. 586; *Manor* v. *Jay County*, 137 Ind. 367, 34 N. E. 959, 36 N. E. 1101; *Tubbesing* v. *Burlington*, 68 Iowa, 695, 24 N. W. 514, 28 N. W. 19; *Goodenow* v. *Litchfield*, 59 Iowa, 226, 9 N. W. 107, 13 N. W. 86; *Minneapolis Trust Co.* v. *Eastman*, 47 Minn. 301, 50 N. W. 82, 930; *Mount* v. *Mitchell*, 32 N. Y. 702; *Kellogg* v. *Cochran*, 87 Cal. 192, 25 Pac. 677, 12 L. R. A. 104; *San Francisco* v. *Pacific Bank*, 89 Cal. 23, 26 Pac. 615, 835; *Marine Bank* v. *National Bank*, 59 N. Y. 73, 17 Am. Rep. 305.

Other decisions sustaining this rule are: *Jacksonville, T. & K. R. Co.* v. *Peninsular Co.*, 17 L. R. A. 33, 66, 27 Fla. 1, 157, 9 South. 661; *Cloud* v. *Malvin*, 108 Iowa, 52, 75 N. W. 645, 78 N. W. 791, 45 L. R. A. 209; *McDermott* v. *Iowa Falls R. Co.*, 85 Iowa, 180, 52 N. W. 181; *Farrell* v. *Pingree*, 5 Utah, 530, 17 Pac. 453; *Evansville* v. *Senhenn*, 151 Ind. 42, 47 N. E. 634, 51 N. E. 88, 41 L. R. A. 734, 68 Am. St. Rep. 218; *Payne* v. *Treadwell*, 16 Cal. 247; *Dougherty* v. *Henarie*, 49 Cal. 686; *Lake Erie R. R. Co.* v. *Griffin* (Ind. App.) 57 N. E. 722; *Lybarger* v. *State*, 2 Wash. St. 552, 27 Pac 449, 1029; *Tolman Co.* v. *Bowerman*, 6 S. D. 206, 60 N. W. 751; *Robinson* v. *Allison*, 97 Ala. 596, 12 South. 382, 604; *Florida Nat. Bank* v. *Ashmead*, 23 Fla. 391, 2 South. 657, 665; *Weld* v. *Johnson Mfg. Co.*, 84 Wis. 537, 54 N. W. 335, 998; *Moore* v. *Beaman*, 112 N. C. 558, 17 S. E. 676; *Hudson* v. *Jordon*, 110 N. C. 250, 14 S. E. 741; *Western News Co.* v. *Wilmarth*, 34 Kan. 254, 8 Pac. 104; *Chamberlain* v. *N. E. R. R.*, 41 S. C. 399, 19 S. E. 743, 996, 25 L. R. A. 139, 44 Am. St. Rep. 717;

*Coulter* v. *Portland Trust Co.*, 20 Or. 469, 26 Pac. 565, 27 Pac. 266; *Merchants' National Bank* v. *Greenhood*, 16 Mont. 395, 41 Pac. 250, 851; *Cincinnati* v. *Cameron*, 33 Ohio St. 336; *Hatto* v. *Brooks*, 33 Miss. 575; *Broom's Succession*, 14 La. Ann. 67; *Ryerson* v. *Eldred*, 18 Mich. 490; Hayne, New Trial and Appeal, 879; *Beck* v. *Thompson*, 22 Nev. 421, 41 Pac. 1.

As illustrative of this doctrine, we quote a few extracts from some of these opinions: *Manor* v. *Board*, 137 Ind. 394, 36 N. E. 1101: "Questions waived by silence of the original brief cannot be presented to this court on a petition for rehearing. (*Fleetwood* v. *Brown*, 109 Ind. 567, 9 N. E. 352, 11 N. E. 779; *Union School Tp.* v. *First Nat. Bank*, 102 Ind. 464, 2 N. E. 194; *Thomas* v. *Mathis*, 92 Ind. 560.)" *Goodenow* v. *Litchfield:* "We feel constrained to hold that after a cause has been submitted, determined, and a rehearing granted, it is too late to raise for the first time such a vital question as that now made in the argument filed in aid of the petition for rehearing; the same not being filed as a matter of right, but simply as a matter of grace and favor of the court." *Kellogg* v. *Cochran:* "We have decided—and with manifest propriety—that we will not grant a rehearing in order to consider points not made in the argument upon which the case was originally submitted." *Schafer* v. *Schafer:* The appellant, in order to avail himself of a question upon which to secure a judgment, must present that question in his brief upon the original submission." The Supreme Court of Florida in *Jacksonville, T. & K. R. Co.* v. *Peninsular Co.:* "The proper function of a petition for rehearing is to present to us any omission or cause for which our judgment is supposed to be erroneous. No new ground or position not taken in the argument submitting the cause can be assumed." *Payne* v. *Treadwell:* "The second ground upon which a rehearing is asked was not taken in the argument or in any of the briefs of counsel. It is too late to urge it now for the first time after the case has been considered upon the points to which the attention of the court was called, and a decision has been rendered."

We understand that appellant, by citing *Beck* v. *Thompson,*

concedes this to be the practice, and suggests that it ought not to apply to a matter that could not have been advanced or waived at the time of the first argument. We have cited more cases to show the uniformity of the rule, as a stronger reason for not departing from it.

If the judgment of the district court and our opinion on appeal were correct at the time they were made, they cannot be invalidated on rehearing by this statute, passed subsequently, even if, for the purposes of the argument, its constitutionality be conceded. It is manifest that the rehearing was not granted for that purpose.

The instruction which we have mentioned as being under special objection is as follows: "No. 10. The jury is instructed that the law distinguishes the necessary nature of a locomotive whistle from that of a stationary whistle, intended for the purpose of notice only; that locomotive whistles are necessary, among other purposes, for the purpose of frightening animals off the track, and to give notice of the approach of trains to persons about to cross the track at such a distance that the bell cannot be heard or the trains readily observed; and that in these and other cases their use upon railroads is both sanctioned and required by law; and that in such cases the usefulness of the whistle depends upon the alarming and frightening character of the noise it makes, and one of the purposes for which it is used is to frighten and to alarm. But the court instructs the jury the rule is different in respect to stationary whistles, intended for notice only, and that if used, if there is no necessity for constructing or operating them in such a way as to alarm or frighten any person or animal of ordinary gentleness, any unnecessary alarming or frightening use of them, if productive of injury to another, is wrongful, and the proprietors should be holden responsible for the injury."

That this instruction draws a correct distinction is apparent upon its face. The right of the appellant to maintain its shops within the city limits, and to use such a whistle as will not endanger people traveling on the street, for the purpose of calling, dismissing, or notifying its employees, is not assailed or denied. That the company may operate its

machinery with all necessary fixtures and appliances is conceded, but this right must be exercised with reasonable care, and so as not to injure or imperil the safety of others. Streets are for the use of the public for travel and transportation. The harm and damage lies in the sounding of a whistle of unusual and unnecessary loudness and discordance in such proximity to a frequented thoroughfare as to frighten horses of ordinary gentleness when rightfully driven there. Locomotive whistles are usually blown at long distances from crossings, to warn and alarm before the bell can be heard. When nearing the track, people with teams are generally on the alert with ear and eye to detect the whistle, noise, or coming of trains, and on their approach either turn away, or have their horses under tighter rein and better control than is usual or is to be expected or required when driving at other places. In traveling the street away from crossings, drivers are not so liable to expect and guard against the frightening of horses by whistles of exceptional volume and discordance. If the use of such be proper on locomotives, as well as of fog-horns at lighthouses, it is not necessary to maintain either on stationary engines so near to the street as to endanger people driving horses of ordinary gentleness. There is a place, as well as a time, for everything under the sun. Whether the appellant maintained and blew a whistle that was unnecessarily alarming, and a menace to defendant's right to drive an ordinarily gentle horse along the highway undisturbed, and which occasioned the accident and injury he sustained, were questions of fact for the jury. (*Topeka Water Co.* v. *Whiting*, 58 Kan. 642; *Hill* v. *P. & R. R. Co.*, 55 Me. 442.)

In the latter case the court said: "The whistle seems to be particularly adapted to give notice of the approach of trains to a crossing of a highway. The object then is to warn all persons of such approach in season to enable them to stop at a safe distance, and thus avoid risk of collision and of alarm to horses."

To make the instruction law it was not necessary for any other court or legislature to have approved a similar one. As new conditions and circumstances arise in the affairs of

men, decisions based on reason and justice must be made and promulgated to meet them. This theory and elasticity has long been the boast of the common law. By way of illustration and comparison, the court assumed and stated that the purpose of locomotive whistles was to frighten and alarm—a matter of common knowledge, and of which proof was not necessary, as claimed by counsel.

Still urging that the district court erred in admitting evidence that another horse had been frightened at a different time by the blowing of the whistle, appellant brings to our attention the case of *Cleveland Ry.* v. *Wynant*, 114 Ind. 525, 17 N. E. 118, 5 Am. St. Rep. 644, in which admission of proof that other horses had shied at freight cars on the crossing was held to be error. This decision has been criticized as a refutation of its own reasoning, and is not in accord with the weight of authority.

In addition to *Knight* v. *Goodyear Co.*, 38 Conn. 442, cited in the opinion, numerous cases hold that the fact that other horses were alarmed or shied has a tendency to show the frightening character of the object, and these decisions also indicate the liability for damages resulting from accidents arising under circumstances similar to those existing here. In *Hill* v. *Portland & R. R. Co.*, 55 Me. 440, 92 Am. Dec. 601, plaintiff, driving a quiet horse, stopped near the crossing because the train was at the depot, the engine being only fifteen or twenty feet from the highway, and he did not think it prudent to pass. The engineer, according to the custom on the road, sounded the whistle twice very sharply and briefly. The horse suddenly turned, and threw the plaintiff out of his carriage. The company was held liable for his injuries. Proof that the sounding of the whistle had a similar effect on other horses was received to show its tendency, and the maxim, "So use your own property as not to injure the rights of another" was applied.

In *Gordon* v. *Boston & Maine R. R.*, 58 N. H. 396, plaintiff was driving about twenty feet from the crossing when steam was allowed to escape suddenly from a locomotive on a side track about two rods from the highway. The noise frightened the horse, and it overturned the carriage. The court refused

to instruct the jury that the defendant was not liable for an injury from the fright of the horse in consequence of the ordinary or necessary or reasonable use of the locomotive upon its own land, not in the highway, but charged that the company, in the management of its engines and machinery, was bound to exercise towards persons traveling the highway crossing the care, skill, and diligence that men of ordinary prudence would use under the circumstances, having due regard to the rights of those attempting to pass. Evidence that other horses were frightened by the noise of the steam from the locomotive was held to be proper.

In *Crocker* v. *McGregor*, 76 Me. 283, 49 Am. Rep. 611, there was a verdict for the plaintiff for an injury caused by the fright of her horse by steam escaping from the defendant's mill, situated on the margin of the public highway. Witnesses were properly allowed to testify that other horses when passing were frightened by the escaping steam.

In *Bemis* v. *Temple*, 162 Mass. 342, 38 N. E. 970, 26 L. R. A. 254, the case was reversed because the trial court rejected evidence that other gentle horses had been frightened by a campaign flag suspended across the street, and the principle that proof of other accidents will not be received was held inapplicable. The court said: "This precise question has been decided in favor of the plaintiff's contention by many courts of the highest respectability, and we have been referred to no decision to the contrary. In *Brown* v. *Eastern & Midlands Railway*, 22 Q. B. D. 391, 393, which was an action for an injury caused by the shying of the plaintiff's horse at a heap of dirt, the Court of Queen's Bench held that the plaintiff was rightly permitted to show that various other horses had previously shied at the same place, and all the judges of the Court of Appeal 'were clearly of opinion that the evidence was admissible, and affirmed the decision of the queen's bench division.' *House* v. *Metcalf*, 27 Conn. 631, was a suit for maintaining a wheel which frightened the plaintiff's horse. The court says the plaintiff 'had a right, not only to show the facts regarding its size, form, location, exposure to view, and mode of operation, from which the jury might infer what effects it would naturally, necessarily, or probably

produce, but also to prove what effects it had produced in fact. * * * The inquiry in every such case is not whether the evidence offered is sufficient to prove the fact claimed, but whether it tends to prove it.' In *Darling* v. *Westmoreland*, 52 N. H. 401, 13 Am. Rep. 55, a suit for damages caused by the fright of a horse at a pile of lumber, evidence was received that other horses had been frightened by the same pile. The justices of the Supreme Court of New York who sat in *Champlin* v. *Penn Yan*, 34 Hun, 33, 37, unanimously sustained the admission of evidence 'that on another occasion, prior to this accident, a flag similar to this in appearance, suspended over the same street and in a similar manner, did frighten other horses when driven along the street under the same.' The Court of Appeals of New York takes a similar view of the law. (*Quinlan* v. *Utica*, 11 Hun, 217; Id., 74 N. Y. 603; *Wooley* v. *Grand Street & Newtown Railroad*, 83 N. Y. 121.)"

In *Topeka Water Co.* v. *Whiting*, 58 Kan. 639, 50 Pac. 877, 39 L. R. A. 90, the plaintiff was driving on the street when the horse became frightened at the water spurting from a hydrant about one hundred feet away, turned suddenly, and capsized the buggy. She received a broken arm and other injuries. The flowing water could have been seen five hundred feet away, but was not noticed by her until the time the horse turned. There was proof that three other driving horses had been frightened. It was held that the license granted by the municipality to the water company to place mains and hydrants and to flush carried with it the obligation to do so with reasonable care and in such a manner as not to imperil the safety of those passing, and that whether an object is calculated to frighten a gentle horse is usually a question for the jury. A verdict for $5,000 was sustained.

Other cases upholding proof of the behavior of other horses and sustaining the recovery of damages are *Folsom* v. *R. R.*, 68 N. H. 461, 38 Atl. 209; *Thomas* v. *Springville*, 9 Utah, 431, 35 Pac. 503; *Crocker* v. *McGregor*, 76 Me. 284, 49 Am. Rep. 611; *Potter* v. *Natural Gas Co.*, 183 Pa. 575, 39 Atl. 7; *Stone* v. *Pendleton*, 21 R. I. 333, 43 Atl. 643; *House* v. *Metcalf*, 27 Conn. 632; *Tomlinson* v. *Derby*, 43 Conn. 563; *Smith*

v. *Sherwood*, 62 Mich. 159, 28 N. W. 806; *Darling* v. *Westmore-land*, 52 N. H. 401, 13 Am. Rep. 55: *Nye* v. *Dibley*, 88 Minn. 466, 93 N. W. 524.

Nor are we able to say that the verdict is excesssive. (13 Cyc. 136, 137.) There was evidence indicating some mental suffering, as well as the injury to the arm and physical disability, and, saddest of all, tending to show an impairment of the mind, which probably no rational men would want to undergo for the amount of the judgment. It is unnecessary to revert to other suggestions made in the elaborate and interesting briefs.

We are still satisfied with the correctness of the opinion as originally rendered herein, and it and the judgment and order of the district court are affirmed.

Remittitur forthwith.

FITZGERALD, C. J.: I concur.

NORCROSS, J., did not participate in the foregoing decision.